Norma GINTER, Plaintiff,

v.

James STALLCUP, Individually and in his official capacity, Lawrence County, Arkansas, James Blasingame, Jack Knox, Boone County, Arkansas, Tom Lee, City of Ravenden, Arkansas, and Roy Norvell, Defendants.

No. LR–C–85–381.

United States District Court, E.D. Arkansas, W.D.

Feb. 24, 1986.

On Motion to Dismiss March 6, 1986.

Supplemental Memorandum and Order June 11, 1986.

Michael Louis Minns, Atty. At Law, Katy, Tex., for plaintiff.

Jeffrey A. Bell, Deputy Atty. Gen., Little Rock, Ark., for James Stallcup.

David H. White, No. Little Rock, Ark., for Tom Lee and City of Ravenden, Ark.

Dick Jarboe, Ponder & Jarboe, Walnut Ridge, Ark., for Lawrence County, Ark.

## MEMORANDUM AND ORDER

EISELE, Chief Judge.

The defendants, James Blasingame and Jack Knox, agents for the Federal Bureau of Investigation, have moved to dismiss the complaint against them pursuant to Rule 12 and Rule 4 of the Federal Rules of Civil Procedure. They moved for dismissal essentially on the seven grounds set forth in their prayer, to wit:

1. Plaintiff has not satisfied the technical requirements of service of process of Rule 4, Fed.R.Civ.P.

2. The complaint should be dismissed for failure to comply with Rule 8(a), Fed.R.Civ.P., and because it fails to state a claim upon which relief can be granted as concerns a *Bivens*-type action or a Title 42, U.S.C., Section 1983 or 1985 suit.

3. The complaint should be dismissed as plaintiff lacks standing to assert the claim and is not the real party in interest.

4. The complaint should be dismissed as Title 42, U.S.C., Section 1983 is not applicable to Federal officials.

5. The F.B.I. defendants are entitled to immunity.

6. The F.B.I. defendants cannot be held liable on a theory of *respondeat superior*.

7. Plaintiff's claim is barred by the doctrine of collateral estoppel.

The Court agrees with the plaintiff that she has satisfied the technical requirements of service of process of Rule 4 in the light of the record that is before the Court.

In plaintiff's response to the motion to dismiss, plaintiff asserts that it has stated the following claims under which relief can be granted:

1. Destruction of personal property by acts of arson by federal and state officials;
2. False imprisonment;
3. Malicious prosecution;
4. Denial of her U.S. Constitutional Right to consult her attorney;
5. Denial of her U.S. Constitutional Right to a fair trial; and
6. Severe mental anguish due to all of the above.

In resisting the defendants Blasingame and Knox's motion to dismiss any *Bivens*-type action, plaintiff states that her claims are more substantial than those in *Bivens;* that she suffered more humiliation by being arrested in the presence of her family; that she was falsely accused, arrested, imprisoned, poorly treated, forced to watch the distruction of irreplaceable accumulated possessions of her lifetime, and forced to observe her husband's anguish.

The Court has carefully examined plaintiff's original complaint to identify the factual allegations that relate to the defendants James Blasingame and Jack Knox, agents of the Federal Bureau of Investigation. Paragraphs I–III do not mention any of the defendants by name. The allegations in those paragraphs and in paragraph IV charge that on June 3, 1983, the home in which plaintiff had been living "was set on fire by the activities of numerous defendants" while the defendants "were attempting to capture the fugitive Gordon Wendell Kahl." Plaintiff claims that her "personal possessions including but not limited .to, clothing, furniture, food, family heirlooms, and pictures of children were destroyed by the alleged acts of arson," which acts were "premeditated." Paragraph VI states:

> The operation was under the control of James Blasingame, the head of the F.B.I. for the entire State of Arkansas, with headquarters in Little Rock, Arkansas, where the acts complained of herein were planned and coordinated to the limited extent that they could be called coordinated.

Paragraph VII charges:

> The operation was either so careless as to constitute negligence and/or reckless burning ... and/or gross negligence, inasmuch as the methods used to capture the alleged fugitive did not meet the minimum standards of conduct and procedures required of law enforcement officials; or in the alternative, it was the deliberate plan of the law enforcement officials....

The plaintiff can only assert claims personal to her and as to which she has standing to sue. Paragraphs VIII, IX and X, (with the exception of the references to the destruction of her personal property in paragraph X) raise issues that the plaintiff has no standing to raise and may be ignored for the purpose of the motions under consideration.

Paragraph I under the caption "CIVIL RIGHTS JURISDICTION" states:

> The civil rights of the Plaintiff have been violated pursuant to 42 U.S.C. 1983 statutes and must be litigated in Federal Court. After her apprehension and arrest by James Stallcup while she was in the custody of Sheriff Roy Norwell of Boone County during her trial in the harboring case (in which she was represented by Court appointed counsel, Charlie Karr) she was denied access to the undersigned, her attorney of record in her capital murder case.

Paragraph I under the caption "CONSTITUTIONAL RIGHTS" charges that the prosecuting attorney, James Stallcup, conspired with other officials "to date unknown" to deny plaintiff certain of her rights. The defendants, Blasingame and Knox, are in no way mentioned or implicat-

ed in these allegations. Under the caption "FACTUAL ALLEGATIONS" there are six separate paragraphs. Paragraph II repeats that:

"all worldly possessions of the Plaintiff were destroyed either by the negligent and/or grossly negligent acts or omissions of the parties complained of herein. . . .

Paragraph III provides:

"James Blasingame, the highest law enforcement official of the United States Government present and (others) . . . jointly governed the conduct of all persons present, or in the alternative, neglected to fullfill their responsibilities as law enforcement officials to properly supervise the scene. The conspiracy was in part organized and planned by F.B.I. agent, Jack Knox, code named "Fort Knox".

It is interesting to note that the last sentence quoted contains the only specific reference in the complaint to Jack Knox other than the allegation as to his residence address. Paragraph IV contains the following sentence:

A conspiracy of conspirators including but not limited to, the Defendants cited herein arose to leave Norma Ginter to face the charges for the death of the fugitive and the Sheriff . . . to protect the illegal personal interests of the Defendants.

Paragraph V appears to complain about rights denied to Norma Ginter in connection with the state charge of capital murder. Its allegations cannot fairly be read to implicate the defendants Blasingame or Knox. Paragraph VI complains about the actions of James Stallcup.

Under the caption "DAMAGES," plaintiff states, inter alia:

She suffered the loss of all of her life time personal possessions which had a fair market value of not less than FIVE THOUSAND DOLLARS ($5,000.00). . . .

The Court has attempted to identify the *factual* allegations which might, when viewed in the light most favorable to the plaintiff, state some claim or claims upon which relief might be granted against defendants Blasingame and Knox.

The defendants Blasingame and Knox have also filed an alternative "motion for summary judgment" contending that there is no genuine issue of material fact which would preclude the entry of summary judgment in their favor as a matter of law. In support of their motion for summary judgment, they have submitted the following:

Exhibit 1: Affidavit for search warrant with attachments including a copy of the F.B.I. "WANTED" poster on Gordon Wendell Kahl.

Exhibit 2: Statement of James T. Blasingame.

Exhibit 3: Statement of Jack D. Knox.

Exhibit 4: The Motion to Suppress Illegally Obtained Evidence filed in the case of *U.S.A. v. Leonard Ginter and Norma Ginter,* Western District of Arkansas No. 83–3009, on August 19, 1983, on behalf of Leonard and Norma Ginter, together with an unsigned copy of the "order on motion to suppress" in the same case.

Exhibit 5: Defendants' Memorandum of Law in Support of Motion to Suppress filed August 8, 1983, on behalf of Leonard and Norma Ginter, among others.

Exhibit 6: Memorandum Opinion filed September 29, 1983, of the Honorable H. Franklin Waters, discussing and disposing of some nine different motions including the Motion to Suppress Illegally Seized Evidence and the motion of the Ginters to suppress incriminating statements.

Exhibit 7: The order of Judge Waters filed September 29, 1983, which, inter alia, denied the Ginters' Motion to Suppress Illegally Seized Evidence and their motion to suppress incriminating statements.

Exhibit 8: This Court's Memorandum and Order, filed March 13, 1984, in the case of *Stephens v. Richard Burgess, et al,* discussing, inter alia, the case of *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959).

The plaintiff has filed a response to the motion for summary judgment filed by Blasingame and Knox with a brief in support thereof. Her response is supplemented by various exhibits as follows:

Exhibit A: A photocopy of pages 1217–1230 of certain discussions between court and counsel including an offer of proof.

Exhibit B: The testimony of one Thomas David Lee.

The plaintiff has also filed a "Supplemental Response" to the defendants' Motion for Summary Judgment to which she attaches the following exhibits:

Exhibit C: Affidavit of the plaintiff, Norma Ginter.

Exhibit D: Excerpts from the testimony of Mr. Dero Downing.

Exhibit E: Affidavit of Roy Jessie Paul.

On October 23, 1985, the defendants, Blasingame and Knox, filed a "Response to Plaintiffs' Response" to the Motion for Summary Judgment. And on November 12, 1985, said defendants also filed another "Response." This latter document points out that the house which was used to harbor Mr. Kahl was not the property of the plaintiff, Ms. Ginter.

Finally, on December 3, 1985, plaintiff filed "Clarification of Errors in the Response of James Blasingame and Jack Knox." For the first time the plaintiff contends that she has "some property rights to the real property maintaining an option to purchase the property" and "Had some type of equitable ownership in the real property." To clarify the matter, the Court wrote to the attorneys on January 10, 1986, seeking to determine if Ms. Ginter was pursuing any claim for any interest in the real property. Her attorney responded, "Ms. Ginter filed suit for personal property loss. She did not file suit for real property loss."

In paragraph VI of the "Clarification" of the plaintiff, we find the following statement:

The undisputed evidence is that defendant Blasingame was the senior law enforcement official there present, and that

Agent Knox was involved in a continuing scheme, (see *State of Arkansas vs. Ginter*, CR–83–37, transcript page 326 and page 340), including perjury (see *U.S. vs. Ward*, 703 F.2d 1058 [ (8th Cir.1983) ] ), and other crimes in order to violate the constitutional rights of individuals in his district in Arkansas.

The Court first observes that it has examined the items referred to within parenthesis in the above quote and finds that they add nothing in support of the allegation that "Agent Knox was involved in a continuing scheme."

From a review of the complaint and the submissions of the parties in connection with the motion to dismiss and motion for summary judgment it is quite clear that the plaintiff's complaint against Mr. Blasingame and Mr. Knox is limited to their involvement at and near the scene of the Ginter residence on the afternoon and evening of June 3, 1983. It is important in this connection to examine the affidavits of Mr. Blasingame, Mr. Knox and Ms. Ginter together with the excerpts from the testimony of Mr. Thomas David Lee, excerpts from the testimony of Mr. Dero D. Downing, and the affidavit of Mr. Roy Jessie Paul.

The pertinent portions of plaintiff Ms. Norma Ginter's affidavit states:

On the afternoon of June 3, 1983, my husband, Leonard Ginter, and I were working on the emergency brakes of the Dodge Omni.

On the evening of June 3, 1983, shortly before 6:00 p.m., my husband left our home to go fishing. He was driving our Dodge Omni. Shortly after that, I heard a noise as if a vehicle were approaching. I thought Leonard might have forgotten something. I heard a dog barking. I went to the garage door to see what was happening. I had not heard anyone calling for me.

I saw at least ten (10) men dressed in camoflauge suits pointing guns at me. I recognized Lawrence County Sheriff,

Gene Matthews, who said to me in a low voice, 'I'm so proud that you came out.'

I saw that two (2) officers had Leonard in handcuffs. One (1) tall and thin officer said he was with the F.B.I. Another officer came and grabbed me quickly and handcuffed me, with my hands behind my back.

I was afraid. I did not answer when I was asked if anyone else was in the house.

Both Leonard and I were forced to lay on the ground. I was close to the garage. I was laid on my back, with my arms behind me. The ground was cold and my arms were hurting from that position. I heard shooting. I felt vibrations in the air from bullets passing.

I was so scared and uncomfortable that I asked if I could turn over. The officer said 'Yes' but no one helped me, so I managed to turn over my myself. I closed my eyes because I was afraid I was going to die. I heard one of the officers say, 'Oh shit, she passed out.'

I was wearing jeans, a tank top and carpet slippers. I was grabbed and dragged—half walking, half being pulled—over brushy overgrown ground to an unmarked car. During this time I lost one (1) of my slippers. I told the officer my slipper was lost. The rough ground was hurting my foot. One (1) of the officers said, 'You don't need the damn slipper.' I was put in the car and my husband was handcuffed to the door-post. The car was guarded by two (2) officers with guns.

I heard more shots. I could see a car go past the car where I was being held. I heard a man shout 'We need MORE FUEL!'

We were made to walk up the hill to a police car. I smelled smoke and I could see smoke on my left, coming from around my garage.

Leonard and I were taken in a police car to Walnut Ridge.

In her "Response to Defendants, Blasingame and Knox's Motion for Summary Judgment," filed October 1, 1985, it is stat-ed in paragraph XIII that "Norma Ginter saw the kerosene placed upon the roof of her home and hereby submits testimony to that effect. See Exhibit 'C'.)" However, as noted above, the only possibly related reference in Ms. Ginter's affidavit is the statement "I heard a man shout, 'We need more fuel!'" Nevertheless the plaintiff does have testimony that a can of diesel fuel or kerosene was placed over a vent on the roof of the house. See the testimony of Mr. Thomas David Lee, who served as the City Marshal for the city of Ravenden, and also as a deputy sheriff for Lawrence County. Mr. Lee states that when he stopped at the road block he heard a call over the radio that "they needed some gas." He requested the fuel from a gentleman who lived in a house a mile or so from the road block. At the time that he obtained the fuel he did not know what it was to be used for. When he arrived at the scene, F.B.I. Agent Jerry King asked him if he and Arkansas State Trooper Steve Huddleston could get the fuel in through the vent on the roof of the house. They responded that they could. Mr. Lee states that he arrived at the actual scene around 6:15 p.m.; he had not heard a shot fired before arriving, but that Agents King and some other agent "tried to shoot the fan on top of the vent,—tried to shoot it off." Mr. Lee states that he and Trooper Huddleston put the can over the vent. He was asked, "how it was going to be gotten down into the vent and into the house?" His reply was: "Well after, after he put it over there, and backed off, and they said they were going to fire into the can and Trooper Huddleston fired two shots into the can." Mr. Lee estimates the vent was from 8 to 12 inches in diameter and the can "set right up on top of it."

Mr. Lee was also asked if he saw anybody throw a tear gas canister or a grenade into the house. He answered "If I'm not mistaken, it was two tear gas grenades and one smokes." He did not hear any loud explosion after they were dropped in, apparently because they were not "the kind of canisters that would explode."

Mr. Lee stayed at the site until about midnight. Mr. Lee states that he was the first one in the house after the fire. He wore a breathing apparatus. He found a bullet in the head of the body that was in the house and retrieved it. He stated that the body was lying approximately two or three feet from the front picture window with the head facing toward the window. "He was laying straight down with no arms and no legs attached to his body."

The testimony of Mr. Dero D. Downing, an F.B.I. agent, was that he knew that everything in the residence, for all practical purposes, had been destroyed. He knew there was a fire at the house. To his knowledge it was caused by "tear gas, things of that nature." He testified also that "there was some talk of some accelerant, possibly kerosene, being used." He does not recall who told him that. He believes that Special Agent Jim Handley and Special Agent Crouch and "several other individuals" were standing around when the statement was made.

Mr. Roy Jessie Paul has worked for the Houston (Texas) Fire Department since December 27, 1971, and since October 3, 1981, he has been a State Certified Arson Investigator. He has had 120 hours of classroom training in arson as well as on-the-job-training, and has investigated between 500 and 1000 fires.

According to his affidavit, Mr. Paul on August 9, 1983, investigated the remains of the Smithville, Arkansas home regarding the fires which occurred on June 3, 1983. He selected samples of burned material for laboratory testing for the presence of accelerants. He had the samples tested by a chemist, Mr. Floyd McDonald, of the Houston Texas Police Crime Laboratory. His affidavits concludes:

A sample of the material taken from the vent of the Ginters' home was found to contain an incendiary substance which indicated that the fire was intentionally set or accelerated.

Mr. Paul's final statement is that his training "indicates that no law enforcement purpose would be served by the addition of accelerants to a residence." The defendants' submissions, just reviewed, would clearly support a finding that kerosene had been used at the direction of F.B.I. Agent Jerry King. In fact, it appears that the use of the kerosene as described by the witness Lee may be conceded even though Mr. Blasingame may have been unaware of it before the fact. See discussion below.

Before reviewing the affidavits of defendants Blasingame and Knox it is important to put the suggested factual issues in context. The defendants, Blasingame and Knox, contend that they are entitled to summary judgment because, inter alia, of the doctrine of good faith immunity. In *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), it is stated that qualified immunity may be demonstrated in motions for summary judgment to "permit the resolution of many insubstantial claims ... and to avoid subjecting government officials either to the cost of trial or to the burdens of broad-reaching discovery." (at p. 817, 102 S.Ct. at 2737–38).

The case of *Mitchell v. Forsyth*, —— U.S. ——, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) is instructive for our purposes. In 1970, Attorney General John Mitchell authorized a "warrantless" wiretap on the telephone of Professor William Davidon, a Haverford College physics professor who was a member of a group known as the East Coast Conspiracy to Save Lives. The F.B.I. had learned that this organization had made plans to blow up heating tunnels linking federal office buildings in Washington, D.C., and had also discussed the possibility of kidnapping National Security Advisor Henry Kissinger. The wiretap was authorized to gather intelligence involving domestic threats to the national security. The wiretaps stayed in place from November 1970 until January 6, 1971. It was not until 1972 that the United States Supreme Court ruled that the Fourth Amendment does not permit the use of warrantless wiretaps in cases involving domestic threats to the national security. *U.S. v.*

*U.S. District Court,* 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972).

Forsyth sued Mitchell and others alleging that the surveillance violated both the Fourth Amendment and Title III of the Omnibus Crime Control and Safe Streets Act. Upon motion for summary judgment, Mitchell contended that the decision in *Keith* should not be applied retroactively and that he was entitled to either absolute prosecutorial immunity or to qualified or "good faith" immunity, the latter under *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). The district court, while rejecting Mitchell's claim of absolute immunity, found that he was entitled to assert a qualified immunity and could prevail if he proved that he acted in good faith. Accordingly, the court denied the motion for summary judgment. This ruling was appealed to the Third Circuit which remanded for further fact finding on the purpose of the wiretap. The district court conducted the fact finding and again concluded that Mitchell was not entitled to absolute prosecutorial immunity. At the same time it reconsidered its ruling on qualified immunity in the light of *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), a case in which, according to Justice White's opinion in *Mitchell:*

> [T]his Court purged qualified immunity doctrine of its subjective components and held that "governmental officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

The district court reviewed Mitchell's argument under this standard, granted Forsyth's motion for summary judgment on the issue of liability, and scheduled further proceedings on the issue of damages. Mitchell again appealed. The Third Circuit agreed with the district court that Mitchell did not have absolute immunity. With respect to the denial of qualified immunity it held that the district court's order was not appealable under the collateral order doctrine. It therefore remanded the case to the district court for further proceedings. Mitchell's petition for certiorari to the Supreme Court was granted.

The Supreme Court, Justice White delivering the opinion of the Court, agreed that Mitchell was not entitled to absolute immunity. Next it held that the district court's denial of qualified immunity was an appealable order. It then reached the issue of Mitchell's claim of qualified immunity. Justice White begins his discussions of this issue as follows:

> Under *Harlow v. Fitzgerald,* Mitchell is immune unless his actions violated clearly established law. See 457 U.S. at 818–819, 102 S.Ct. at 2738; see also *Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 3018, 82 L.Ed.2d 139 (1984). Forsyth complains that in November 1970, Mitchell authorized a warrantless wiretap aimed at gathering intelligence regarding a domestic threat to national security—the kind of wiretap that the Court subsequently declared to be illegal. *Keith, supra.* The question of Mitchell's immunity turns on whether it was clearly established in November, 1970, well over a year before *Keith* was decided, that such wiretaps were unconstitutional. We conclude that it was not.

The Court examined the status of the law at the time of Mitchell's decision to install the wiretap. Justice White then concluded that:

> Of course, *Keith* finally laid to rest the notion that warrantless wiretapping is permissible in cases involving domestic threats to the national security. But whatever the agreement with the Court's decision and reasoning in *Keith* may be, to say that the principle *Keith* affirmed had already been "clearly established" is to give that phrase a meaning that it cannot easily bear. The legality of the warrantless domestic security wiretap Mitchell authorized in November 1970, was, at that time, an open question, and *Harlow* teaches that officials performing discretionary functions are not subject to suit when such questions are resolved

against them only after they have acted. The District Court's conclusion that Mitchell is not immune because he gambled and lost on the resolution of this open question departs from the principles of *Harlow*. Such hindsight-based reasoning on immunity issues is precisely what *Harlow* rejected. The decisive fact is not that Mitchell's position turned out to be incorrect, but that the question was open at the time he acted. Hence, in the absence of contrary directions from Congress, Mitchell is immune from suit for his authorization of the Davidon wiretap notwithstanding that his actions violated the Fourth Amendment.

So the question here is: did the actions of Mr. Blasingame or Mr. Knox "violate clearly established statutory or constitutional rights of which a reasonable person would have known?" *Harlow v. Fitzgerald.* The question requires the Court to identify the actions of Mr. Blasingame and Mr. Knox of which Ms. Ginter complains. We have already reviewed the allegations of Ms. Ginter's complaint. We now look at the affidavits of Mr. Blasingame and Mr. Knox.

■ We first take up the affidavit of Mr. Knox because it appears therefrom that he was not even present at the scene on June 3, 1983. Nor does it appear that he had any knowledge of the use of, or the intention to use, any flammable substance. Mr. Knox states that he is a Special Agent of the F.B.I. and has been such since 1963. He has been assigned to the Fayetteville office since 1974. On May 30, 1983, he was asked to participate in the federal investigation of Gordon Wendall Kahl a fugitive who was charged with the murders of two deputy U.S. marshals. He interviewed Karen Russell Robinson on May 30, 1983, and was informed by her that her father, Arthur Russell and others had harbored Mr. Kahl in the Mt. Home, Arkansas, area. Mr. Knox reported this information to the Little Rock office of the F.B.I.

On June 1, 1983, Karen Robinson informed Mr. Knox that Mr. Kahl had departed the Mt. Home, Arkansas, area at approximately 10:00 a.m. on May 30, 1983, in the company of "Leonard and Norma," last names unknown, in a small cream-colored foreign car. According to Mr. Knox's affidavit, Ms. Robinson also informed him that Mr. Kahl was in possession of various firearms and planned to travel to Texas to obtain automatic weapons to take to Wyoming or Montana. Mr. Knox passed this information along to the Little Rock F.B.I. office. The last two paragraphs of Mr. Knox's affidavit read as follows:

7. I was not present at and did not participate in the subsequent search of the residence of Norma Ginter on June 3, 1983, as I was tasked by my superiors to remain in the Mountain Home, Arkansas, area. I neither prepared the search warrant for the Ginter residence nor participated in the planning of the execution of that warrant.

8. All actions taken by me in connection with the Kahl investigation and relating to the plaintiff, Norma Ginter, were performed within the scope of my employment, and with a good faith reasonable belief in the lawfulness of my actions. At no time did I conspire with any person to violate the rights of Norma Ginter, Gordon Wendall Kahl, or any person.

So it appears that Mr. Knox was not a participant in any of the events occurring at or near the Ginter residence near Smithville, Arkansas, on June 3, 1983. Ms. Ginter has submitted no affidavits or testimony to the contrary.

Mr. Blasingame was involved in some of the events occurring on June 3, 1983, near the residence of the Ginters. His affidavit is therefore much longer than Mr. Knox's. Mr. Blasingame was the Special Agent in Charge of the Little Rock office of the F.B.I. at the time and had been since 1982. He was asked to participate in the federal investigation of Gordon Wendall Kahl who was then a fugitive charged with the murders of two deputy U.S. marshals. During the course of his investigation he received information indicating that Mr. Kahl was a tax protestor, a federal parole violator and a member of the organization known as "Sheriff's Posse Comitatus," and that he

and others on February 13, 1983, killed two deputy U.S. marshals, severely wounded a third marshal, a North Dakota deputy sheriff, and a Medina, North Dakota, police officer at Medina, North Dakota, through the use of automatic weapons.

On June 1, 1983, Mr. Blasingame received information indicating that Mr. Kahl had been hiding in the North Arkansas area. On June 2, 1983, he received the information reported by Karen Russell Robinson that Kahl had departed the Mt. Home, Arkansas, area at approximately 10:00 a.m. on May 30, 1983, in the company of Leonard and Norma, last name unknown, in a small cream-colored foreign car and that Kahl was reported to be in possession of firearms. On June 3, 1983, he learned that Leonard and Norma could possibly be Leonard and Norma Ginter of Smithville, Arkansas, who were reported to drive a cream-colored Dodge Omni and that Leonard Ginter was a known tax protestor. Shortly thereafter he learned that a 1980 Dodge Omni, bearing Arkansas license no. KAP—366 was registered to the Life Science Church, Smithville, Arkansas, the trustee being David Ginter. Mr. Blasingame was also made aware that the Life Science Church was associated with the "Sheriff's Posse Comitatus" to which Kahl belonged. He also was made aware that the Ginters had a son by the name of David. On June 2, 1983, from his position in an airplane, Mr. Blasingame personally observed a small cream-colored Dodge Omni in the driveway of the residence of Norma and Leonard Ginter. On June 3, 1983, he, as affiant, obtained a search warrant authorizing a search of the Ginter residence for federal fugitive Gordon Wendall Kahl.

The rest of Mr. Blasingame's affidavit which deals with his actions on the site on June 3, 1983, reads as follows:

11. A plan was then initiated wherein Lawrence County, Arkansas, Sheriff Gene Matthews, Arkansas State Trooper Ed Fitzpatrick, Deputy United States Marshal Jim Hall, and myself would approach the Ginter residence in an automobile and, from a location affording as much protection as possible, Sheriff Matthews would call the Ginters from the house, as the county sheriff is the only law enforcement officer recognized by the group "Sheriff's Posse Comitatus," to which Kahl belonged. If the Ginters refused to come out, we were to move away from the residence and periodically continue our efforts to contact the Ginters. No one was to approach the Ginter residence at this time. Included in this plan was the assignment of various individuals to back-up and perimeter duties.

12. Just prior to the arrival of Sheriff Matthews, State Trooper Fitzpatrick, Deputy United States Marshal Hall and myself at the Ginter residence, I learned that Leonard Ginter was stopped exiting the driveway of the Ginter residence in his cream-colored Dodge Omni. I arrived at the Omni and observed Ginter to have a rifle and was told he also had a cocked pistol.

13. At this time Leonard Ginter advised me that Norma Ginter, and nobody else, was in the Ginter residence. He indicated he would be willing to call Norma Ginter from a position near the front of the garage of the residence and have her exit the residence.

14. Sheriff Matthews, State Trooper Fitzpatrick, Deputy United States Marshal Hall, Leonard Ginter and myself then proceeded to the front of the garage, and from there Ginter notified his wife to come out as the "FBI" wanted to talk to them.

15. Norma Ginter exited the residence and when asked stated nobody else was in the residence.

16. As I was interviewing the Ginters and about to show them the search warrant authorizing the search of their residence for Kahl, I heard gunfire.

17. I immediately accompanied Norma Ginter around the corner of the garage in what appeared to be a safe position.

18. Deputy United States Marshal Hall shortly thereafter came from

around the same corner of the garage and informed me that Sheriff Matthews had been shot.

19. Both Leonard and Norma Ginter were thereafter removed from the area, and believing automatic weapon fire to be emanating from the residence, I concurred with the delivery of teargas projectiles into the Ginter residence.

20. I thereafter returned to Leonard Ginter and displayed a wanted flyer with a photograph of Gordon Wendall Kahl to Leonard Ginter who indicated Kahl was in the house alone.

21. I returned to a position near the residence and reported Ginter's information to those nearby.

22. Due to exposure to teargas, I was forced to leave the immediate area and return to the location where the Ginters then were. Leonard and Norma Ginter were arrested for harboring a fugitive and removed to the Lawrence County, Arkansas, Jail.

23. At approximately 7:00 p.m., I learned there was a fire in the Ginter residence and I thereafter ordered a fire truck to be sent from Imboden, Arkansas. At this time I also heard what sounded like thousands of rounds of ammunition exploding in the fire within the Ginter residence.

24. At approximately 9:00 p.m., I was advised by Arkansas state officials that charges of murder were being contemplated against Leonard and Norma Ginter for the death of Sheriff Matthews.

25. I did not participate in any alleged plan to introduce flammable material into the Ginter residence in an effort to force the occupant out nor did I take any action at the scene to accomplish this alleged activity.

26. All actions taken by me in connection with the Kahl investigation relating to plaintiff Norma Ginter were performed within the scope of my employment, and with a good faith reasonable belief in the lawfulness of my actions. At no time did I conspire with any person to violate the rights of Norma Ginter,

Gordon Wendall Kahl, or any other person.

The Court notes Mr. Blasingame's statement that he did not participate in any plan to introduce flammable material into the Ginter residence nor take any action at the scene to accomplish that activity. Ms. Ginter offers no affidavit or evidence to the contrary.

It is clear beyond any doubt that Mr. Knox's motion to dismiss and motion for summary judgment must be granted, both upon the basis of *Harlow v. Fitzgerald* and for other obvious reasons.

Under *Harlow* and *Mitchell,* discussed above, it is necessary to determine if Mr. Blasingame is entitled to qualified or "good faith" immunity as a matter of law. Again we ask: Did his conduct violate clearly established statutory or constitutional rights of which a reasonable person would have known?

The thrust of Ms. Ginter's complaint against Mr. Blasingame is that he caused the destruction of her property by fire. The submissions of the parties do not make it clear what the cause or causes of the fire were. From the submissions it is possible to contend factually that the fire was caused by the tear gas canisters or the smoke bomb or the explosion of ammunition within the house, or by the diesel fuel or kerosene that entered through the vent. It is also possible that fires resulted from one, two, three, or all four of these possibilities. Mr. Blasingame's affidavit states that, "Believing automatic fire to be emanating from the residence, I concurred with the delivery of tear gas projectiles into the Ginter residence." There is no direct evidence that the tear gas projectiles could have, or did, cause the fire.

 Accepting the unopposed statement in the affidavit of Mr. Blasingame as to the information he had received and his state of mind, the question is would his "concurrence" or even direct authorization of the use of tear gas projectiles under the circumstances violate clearly established statutory or constitutional rights of which a reasonable person would have known? Mr.

Blasingame states that before he concurred in the use of the tear gas projectiles, he had been informed by Deputy U.S. Marshal Hall that Sheriff Matthews had been shot and that automatic weapon fire was emanating from within the house.

Ms. Ginter has cited no law which would suggest that the use of tear gas under the circumstances would violate any clearly established statutory or constitutional rights of her or of Mr. Kahl for that matter. It therefore appears that Mr. Blasingame is entitled to qualified immunity as a matter of law.

Ms. Ginter has submitted the testimony of Mr. Lee indicating that F.B.I. Agent Jerry King asked him and Arkansas State Trooper Steve Huddleston to put the can of fuel on the vent of the house with the plan of shooting holes in the can to permit the introduction of the diesel fuel or kerosene through the vent and into the house. To carry out this plan, apparently Trooper Huddleston fired two shots into the can.

The plaintiff has not made F.B.I. Agent Jerry King a defendant in this action. She suggests, however, given an opportunity at full discovery, that she might develop a link between Mr. Blasingame and Mr. Jerry King's actions, i.e., that someone might testify that Mr. Blasingame directed Mr. King to obtain and use the fuel. But even assuming that Ms. Ginter through discovery might make a genuine factual question along that line, what difference would it make? In that event, this Court would be faced with the question under *Fitzgerald* and *Harlow* whether the authorization of the use of the diesel fuel or kerosene under the circumstances would have violated any clearly established statutory or constitutional rights of either Ms. Ginter or Mr. Kahl. The use of fire to force an armed subject, who is reasonably believed to be an armed and dangerous murderer, out of a house has not been shown by Ms. Ginter to violate any statutory or constitutional right which had been "clearly established" prior to June 3, 1983. So the Court sees no reason to open discovery on this point.

Ms. Ginter has, as shown above, brought forward the affidavit of Roy Jessie Paul. Mr. Paul worked for the Houston, Texas, Fire Department since 1971 and has been a State Certified Arson Investigator since October 3, 1981. The last statement of his affidavit is that his "training indicates that no law enforcement purpose would be served by the addition of accelerants to a residence." The case of *McKinley v. Trattles*, 732 F.2d 1320, 1324 (7th Cir.1984) points out that the S.Ct. in *Harlow* "indicated that immunity was a question of law for the judge to decide in the light of the 'state of the law.'" It goes on to state "We do not believe a jury is competent to decide the 'state of the law.'" So it is not a question of the opinion of an arson investigator or even of a law enforcement officer. Rather the question is, what is there in the statutory law, pertinent regulations, or caselaw, prior to June 3, 1983, which would indicate that the actions of Mr. Blasingame, assuming that he authorized the use of fuel to "burn out" Mr. Kahl, violated clearly established law?

On January 29, 1986, the Court put this question to the parties for their comments and argument. The Court's letter re this issue stated:

Mr. Minns suggests that, given an opportunity for full discovery, he might establish that Mr. Blasingame directed FBI Agent Jerry King or others to use diesel fuel or kerosene to "burn out" Mr. Kahl. I would appreciate the parties bringing to my attention any statutes, regulations or cases which would indicate that the use of such procedure would violate the clearly established rights of anyone in a position similar to that of Mr. Kahl or Ms. Ginter on June 3, 1983. In other words, assume that law enforcement officers honestly believe that a heavily armed fugitive, charged with murder, is "holed up" in a house or building. Is there "any clearly established law" that, in discharging their duties to apprehend that fugitive, they may not intentionally set fire to the building or house in order to force him out? My question here is

whether Mr. Kahl, had he survived, would have had any right of action against the law enforcement officers in such circumstances. We are not here dealing with the rights of an innocent third party whose house might be occupied by such a fugitive and whose property might be destroyed as a consequence of such police action.

The question is whether such action by law enforcement officers under such circumstances (i.e., the use of fire to force a fugitive from hiding) would be contrary to clearly established law.

The government, while noting that the burden is on Ms. Ginter to point to the law that supports her claim, states that no clearly established law prohibited the use of such procedure to execute the arrest and search warrants [1] in an effort to capture an armed fugitive who had fired his weapon(s) at law enforcement officers. It cites *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) and *Steagald v. U.S.*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). Of course, the government also argues that it is immaterial whether the fugitive Kahl might have a cause of action because such rights are personal. However, in determining the rights of Ms. Ginter with reference to her property claim against the *individual* FBI Agents, it is important to determine whether those officers were acting contrary to any clearly established law. We are not here dealing with an action against the government.

The government also cites *Amato v. U.S.*, 549 F.Supp. 863 (D.N.J.1982) in which a bank robber brought a FTCA claim against the government. There the FBI found out that the robbery was planned and staked out the scene. One of plaintiff's accomplices saw the FBI agents and fired a shot. Within thirty-three seconds, the eleven FBI agents fired their weapons 39 times firing 281 bullets and buckshot. The plaintiff received 65 wounds and his car was hit 141 times. Plaintiff survived and sued. The court ruled that the FBI agents had not used excessive force. It stated:

> [The plaintiff's] accomplice fired the first shot which set the forces of destruction in motion. Plaintiff bears responsibility for those acts. Return fire was foreseeable. Confusion was foreseeable. Injury and death were foreseeable.
>
> Each individual agent who was placed in fear of bodily harm or who reasonably believed that he or his colleagues were in such danger had the right to respond with equal force. Having gone to a bank with the intention of robbing it, armed with loaded weapons, and firing such weapon at an FBI agent, the plaintiff is responsible for the foreseeable consequences. It is foreseeable that he who lives by the gun shall die by the gun.

The plaintiff in her response to the Court's letter of January 29, 1986, first cites Arkansas Statutes 43–413 and 43–430. The former states that no unnecessary force or violence shall be used in making an arrest. The latter sets forth guidelines for stopping or detaining a person reasonably suspected of committing a felony or about to commit a felony.

Ms. Ginter further argues that the fire was not used for the purpose of forcing a fugitive from hiding. It is plaintiff's theory that Mr. Kahl was already dead when the fire occurred and that there was no legitimate law enforcement purpose served

---

1. In her federal criminal case, Ms. Ginter moved to suppress evidence seized contending that the affidavits for the search warrants were insufficient to establish probable cause under the Fourth Amendment. Judge Waters denied the motion in a lengthy opinion entered September 27, 1983. At the same time he overruled Ms. Ginter's motion to suppress incriminating statements. In that motion, Ms. Ginter claimed that the statements were the fruit of an illegal arrest. Judge Waters stated "[I]t is beyond doubt that the authorities collectively possessed reasonable grounds to believe that the Ginters had committed the crime of concealing or conspiracy to conceal Gordon Kahl." He concluded that Ms. Ginter, and other defendants, were not entitled to any relief based on the asserted invalidity of their arrests. So it does appear that these two potential bases for charges by Ms. Ginter of violations of her constitutional rights by Mr. Blasingame or Mr. Knox have been dealt with judicially and resolved against her.

by the use of the fire. The question for the Court here, however, is not whether Mr. Kahl might have been killed before the fire commenced, but whether the law enforcement officers reasonably believed that he was still alive (and therefore posed a threat) at the time. There is nothing in any of the factual submissions which suggests that any of the law enforcement officers knew or believed that Mr. Kahl was dead when the fire commenced. All of the inferences are to the contrary.

Like the government, the plaintiff's counsel in effect suggests that it is irrelevant that Mr. Kahl might have had a cause of action had he survived. Plaintiff's brief states:

> The alleged fugitive apparently was a politically oriented individual, a suspect in a relatively serious matter and a person who had deliberately chosen the course of action he was pursuing.

By contrast, Ms. Ginter is described as a law-abiding, non-political, family-oriented individual with no criminal record. The plaintiff concludes:

> The issue of whether or not plaintiff in *fact* has a civil rights cause of action is not inextricably linked to whether or not, by speculation, the deceased subject may have had a cause of action if he had survived.

The Court is convinced on the basis of all the submissions of the parties that there are no genuine issues of fact with respect to Mr. Blasingame's and Mr. Knox's claims of qualified immunity. Ms. Ginter has not brought the Court's attention to any clearly established law which movants' conduct on June 3, 1983, violated. The claims against Mr. Blasingame and Mr. Knox must therefore be dismissed.

In *Steele v. City of Houston*, 603 S.W.2d 786, police officers caused the destruction of plaintiff's home and belongings while attempting to recapture three escaped convicts who had without permission taken refuge in the house. It was alleged that

persons in the Police Department discharged incendiary material into the residence in a manner designed to cause, and for the purpose of causing, the residence to catch fire. They also alleged that after the Houston Fire Department arrived, the police officers prevented the Fire Department from putting out the fire. The case discusses at length the Texas law with respect to the civil liability for such actions but the important language for our purposes is found in the concluding paragraph of the opinion which states:

> The city argues that the destruction of the property as a means to apprehend escapees is a classic instance of police power exercise for the safety of the public. *We do not hold that the police officers wrongfully ordered the destruction of the dwelling;* we hold that the innocent third parties are entitled by the Constitution to compensation for their property. (Emphasis added.)

On the issue of qualified immunity, the *Steele* case could be used to argue that the alleged acts of the movants, even assuming they ordered the "burn out," (which is denied) would have been lawful under the uncontradicted facts and circumstances. The parties have not brought the Court's attention to any clearly established law to the contrary, and the Court's independent research has found none.

The courts may, in response to such police tactics as were publicized in relation to the effort to apprehend persons in the M.O.V.E. Headquarters in Philadelphia, PA in 1985, conclude that such methods under such circumstances would violate the constitutional rights of the persons harmed. Indeed, courts might hold on the basis of the facts in this case that the use of fire to "burn out" a fugitive would violate the constitutional rights of the fugitive Kahl.[2] But the point is that no such court had so held prior to June 3, 1983.

By its letter of January 29, 1986, to the attorneys for the parties, the Court, *sua*

---

**2.** But the Court doubts that any court would so hold given the circumstances of the shooting of the sheriff. The Court is doubtful that law enforcement officers are going to be required to simply "wait out" or "starve out" a fugitive under such circumstances.

*sponte,* raised another issue and asked for the parties' views thereon.

> As you know the defendants have claimed that the plaintiff's claim is barred by the doctrine of collateral estoppel. There is a possible aspect of that claim that has not been briefed by the parties. As I understand it, the plaintiff, Ms. Ginter, was indicted for harboring Mr. Kahl, and that she was convicted of that charge. (I request the government to provide me with a copy of the indictment, a copy of the jury's verdict, and a copy of the judgment and commitment order.)
>
> The question I am raising and which I wish you to brief is: whether public policy requires the denial of Ms. Ginter's claim for the recovery for the loss of her property because of her violation of the law in harboring Mr. Kahl. In other words, had Ms. Ginter not harbored Mr. Kahl in her home, the necessity of apprehending him therein would not have occurred nor would her property have been placed at risk. Should not public policy deny the use of the courts to a person such as Ms. Ginter who, by virtue of her conviction, is found to be essentially *in pari delicto* with Mr. Kahl?

Ms. Norma Ginter was indicted on two counts of a three-count indictment filed on June 21, 1983. The first paragraph of the first count charges as follows:

> That from on or about the last week in February, 1983 and continuing through June 3, 1983, in the Western District of Arkansas, Harrison Division, and elsewhere, LEONARD G. GINTER, NORMA GINTER, ARTHUR H. RUSSELL, ED UDEY, IRENE UDEY, and other individuals unknown to the Grand Jury, did unlawfully and wilfully combine conspire and agree together and with each other to commit an offense against the United States, that is to violate 18 U.S.C. Section 1071 by harboring and concealing Gordon Kahl who was a fugitive from justice and was evading arrest and apprehension.

The second count against Ms. Ginter (Count III) charges as follows:

> On or about May 30, 1983, in the Western District of Arkansas, Harrison Division, LEONARD G. GINTER and NORMA GINTER, aiding and abetting each other, having notice and with knowledge that a warrant had been issued for the apprehension of Gordon Kahl under the provisions of a law of the United States on a charge of violating Title 18, United States Code, Section 1111, a felony, and after having notice and with knowledge that Gordon Kahl was, in fact, a fugitive and was evading arrest and apprehension under said warrant, wilfully and for the purpose of preventing his discovery and arrest on said warrant did harbor and conceal Gordon Kahl in the Ginter vehicle, in that the Ginters obtained and rendered to Gordon Kahl transportation, sustenance and services, in violation of 18 U.S.C. Section 1071.

Ms. Ginter was found guilty by a jury on both counts. The Judgment/Commitment Order states her sentence to be as follows:

> The defendant, Norma Ginter, is hereby committed to the custody of the Attorney General of the United States, or his authorized representative for a term of five (5) years on each of Counts I and III of the indictment; and on condition that the defendant be confined in a jail type or treatment institution for the period of time already served, the execution of the remainder of the sentence of imprisonment on each count is hereby suspended and the defendant is placed on probation for a period of five (5) years.

The facts and circumstances surrounding the attempt to apprehend Mr. Kahl on June 3, 1983, are set forth in the affidavits filed in support of the motion for summary judgment.

In the case of *U.S. v. James Lee Smith,* 659 F.2d 97 (8th Cir.1981), the facts are stated by the court of appeals as follows:

> An agent of the Drug Enforcement Agency (DEA) contacted Smith in July of 1976, after the DEA learned that Smith would be interested in buying a quantity of hashish. Smith stated he desired to purchase thirty pounds of hashish and

could pay $25,000 immediately and would be able to pay the balance of the $39,000 total price within a few days. Smith and another DEA agent met at a Des Moines hotel on July 22, 1976, to exchange the cash for the hashish. In the parking lot, the two first went over to the agent's car and the agent showed Smith the hashish contained in a briefcase. After Smith looked at it, the agent requested to see the money so the two men walked over to Smith's car. Smith opened the trunk and a briefcase in it which contained a brown envelope. Smith indicated that the $25,000 was in the envelope. The agent opened the envelope and saw that it did contain some money.

Because Smith wanted to test the hashish, the two men returned to the agent's car. The agent opened a brown suitcase holding two cardboard boxes full of phone books and represented that the boxes held the remainder of the hashish. The agent did not let Smith open the boxes and told Smith that he had to have control of the money before he would give up the hashish. The men agreed to put their cars side by side and Smith said he would test the hashish in the agent's car while the agent counted the money in Smith's car. While the agent examined the money, he saw Smith trying to open the suitcase full of phone books. When Smith asked the agent for the keys to the suitcase, the agent got out of Smith's car and arrested him.

After Smith pled guilty to several drug offenses, he was sentenced to prison and fined. He served his sentence and paid the fine.

The government kept possession of Smith's automobile through statutory procedures. No forfeiture proceedings were instituted regarding the $25,000, but the government also kept possession of it.

The government filed a declaratory action seeking a ruling that the money was the property of the United States. Smith filed a cross motion for summary judgment claiming entitlement to the $25,000. The district court entered summary judgment

in favor of Smith and the government appealed.

The lower court in *Smith* was of the opinion that the forfeiture statutes provide the only method by which the government may retain such money. It rejected the illegal contract theory. The Eighth Circuit reversed, relying upon *U.S. v. Farrell,* 606 F.2d 1341 (D.C.Cir.1979). The Eighth Circuit held as follows:

(2) This case is indistinguishable from *United States v. Farrell, supra,* 606 F.2d at 1341, and we follow that court's well-reasoned opinion. Farrell placed $5,000 on a counter before an undercover officer in the mistaken belief that the officer would give him heroin in return. *Id.* at 1343. The *Farrell* court was confronted with the same issue that is before us: "The issue here is whether the Government may retain the money *after* Farrell has been convicted." *Id.* at 1347. The court noted that "[c]ourts will not aid those whose cause of action is based upon an illegal act" and that "denying recovery to one who transgresses positive law is thus based on *public policy.*" *Id.* at 1349. Utilizing those general principles, the court denied Farrell the aid of the courts and the government was allowed to keep possession of the money.

We reach this result * * * because it is contrary to public policy to permit the courts to be used by the wrongdoer Farrell to obtain the property he voluntarily surrendered as part of his attempt to violate the law. If as the cases hold it is sound public policy to deny the use of the courts to persons *in pari delicto* who seek the return of illegally paid money, *a fortiori* it is sound public policy to deny the aid of the courts to a single violator of the law who seeks the return of money paid to a government agent in an attempt to contract for the purchase of contraband drugs. * * * * [T]his case is more properly disposed of by an application of the narrow rule that public policy will not permit the courts to be used to aid a wrongdoer to recov-

er money paid to induce an illegal contract.

*Id* at 1350.

As in *Farrell*, public policy requires us to deny Smith the aid of the courts in his efforts to regain the $25,000 he used to induce an illegal contract to purchase hashish. We accordingly reverse the judgment of the district court and order that summary judgment be entered in favor of the government.

Here Ms. Ginter was convicted of conspiring to violate 18 U.S.C. § 1071 "by harboring and concealing Gordon Kahl who was a fugitive from justice and was evading arrest and apprehension." In a conspiracy, each of the conspirators is considered to be the agent of the others. The conspiracy is alleged to have occurred from the last week in February 1983 and continuing "through June 3, 1983." Furthermore, Ms. Norma Ginter was convicted of a violation of section 1071 for acts occurring "on or about May 30, 1983."

Defendants' counsel in his response to the Court's inquiry of January 29, 1986, points out that Judge Waters, in sentencing Ms. Ginter, stated that the Court did not believe that Ms. Ginter did much other than be a good wife in "a good old-fashioned sort of way." He also points out the evidence tended to show that Ms. Ginter tried to disassociate herself from acts of her husband in harboring Mr. Kahl. However, the jury resolved those issues against her.

■ The Court is of the opinion and concludes that it would be contrary to public policy to permit Ms. Ginter to recover for her lost property. It was the harboring of Mr. Kahl which occasioned the necessity for the actions which occurred on June 3, 1983.

Ms. Ginter argues that she was not, in any event, in the act of harboring Mr. Kahl at the time of the fire or the shooting. Indeed, she was in custody at the time. Nevertheless, the very real and clearly foreseeable consequence of her involvement in the harboring continued.

So Ms. Ginter is not only barred from pursuing the case because of the qualified immunity of Mr. Blasingame and Mr. Knox but also because it would be against public policy to permit her to proceed against said defendants under the facts and circumstances set forth above.

The government urges several other bases for the dismissal of the complaint against the defendants Blasingame and Knox and/or the granting of the motion for summary judgment in their favor. The Court will not discuss these issues at length in view of its previous rulings.

■ The government contends that the complaint fails to state a claim upon which relief can be granted under Title 42 U.S.C. § 1983 or § 1985. The plaintiff has specifically stated that she is not raising a claim under section 1985. The government contends that section 1983 is not applicable to federal officials. The plaintiff responds that they were acting pursuant to a state search warrant and were therefore acting "under color of state law." It is recognized that private persons can be held under section 1983 if they conspire with or act in concert with state officers. But here we are not dealing with private persons. We are dealing with two FBI agents who were clearly, under the submissions of the parties, carrying out their duties as federal law enforcement officers. As indicated above, the Court has concluded that the conspiracy allegations, fairly read, are completely inadequate to state a claim against either of these federal officers. See *Arsenaux v. Roberts*, 726 F.2d 1022, 1024 (5th Cir.1982). The Court therefore concludes that the plaintiff may only proceed against these federal officers under a *Bivens* type action. Under both *Bivens* and section 1983, the FBI agents cannot be held liable simply on the theory of *respondeat superior*. Also the principles of *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) apply in a *Bivens* type action just as they do in a section 1983 action. See *Lehman v. Weiss*, 454 U.S. 807, 102 S.Ct. 80, 70 L.Ed.2d 76 (1981), *vacating*, 642 F.2d 265 (9th Cir.1981), *on*

*remand,* 676 F.2d 1320 (9th Cir.1982). It does appear to the Court that the government is correct when it asserts that, while due process ordinarily requires a pre-deprivation notice and hearing, nevertheless when there is a necessity for quick action or the impracticality of providing any meaningful pre-deprivation process, then the due process requirements could be satisfied if there is a meaningful means by which to assess the propriety of the officers' actions at sometime after the event. It is the government's contention that both the state of Arkansas and the federal law provide the plaintiff with such remedies. See Ark.Stat. 41–1954 and the Federal Tort Claims Act.

One final word. The Court is somewhat uncomfortable in not permitting the plaintiff to conduct discovery in this case with respect to her claims against the movants, Mr. Blasingame and Mr. Knox. However, the Court is convinced that it would not be vindicating the policy of the Supreme Court as announced in *Harlow* and many other cases, if it permitted discovery to go forward under the facts and circumstances of this case. The Supreme Court has noted that "substantial costs attend the litigation of the subjective good faith of government officials" (*Harlow,* 457 U.S. pp. 816–17, 102 S.Ct. at 2737–38). The Court went on to state:

> Not only are there the general costs of subjecting officials to the risks of trial— distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service. There are special costs to "subjective" inquiries of this kind. Immunity generally is available only to officials performing discretionary functions. In contrast with the thought processes accompanying "ministerial" tasks, the judgments surrounding discretionary action almost inevitably are influenced by the decision-maker's experiences, values, and emotions. *These variables explain in part why questions of subjective intent so rarely can be decided by summary judgment.* Yet they also frame a background in which there

often is no clear end to the relevant evidence. *Judicial inquiry into subjective motivation therefore may entail broad-ranging discovery and the deposing of numerous persons, including an official's professional colleagues.* Inquiries of this kind can be peculiarly disruptive of effective government. (emphasis added).

Where the plaintiff can point to no clearly established law that the federal agents violated, they will be entitled to qualified immunity, as discussed above, regardless of their subjective state of mind. As stated in *Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 3018, 82 L.Ed.2d 139:

> "Whether an official may prevail in his qualified immunity defense depends upon the objective reasonableness of [his] conduct as measured by reference to clearly established law." *No other "circumstances" are relevant* to the issue of qualified immunity.

Where there are no disputed facts with respect to the issue of qualified immunity, summary judgment must be allowed and discovery must be withheld pending the resolution of that issue. As stated in *Elliott v. Perez,* 751 F.2d 1472 (5th Cir.1985), at p. 1479:

> Allowing pretrial depositions, especially those taken adversely of the government official to ferret all of his actions and the reasons therefor, either for the purpose of being able to plead more specifically, or for use in the prospective trial would defeat and frustrate the function and purpose of the absolute and qualified immunity ostensibly conferred on the official.

Finally, the Court notes the language in *Krohn v. United States,* 742 F.2d 24 (1st Cir.1984):

> A plaintiff, before commencing suit, must be prepared with a *prima facie case of defendant's knowledge of impropriety, actual or constructive.* In order to defeat a motion for summary judgment, or to impose upon the defendant the burdens of pretrial discovery, a plain-

tiff must show more than "a mere desire to cross-examine" but must furnish "[a]ffidavits or sworn or otherwise reliable statements of witnesses." Alternatively, but with a much higher burden than is borne by the plaintiff who opposes an ordinary summary judgment motion, a plaintiff may seek permission for discovery, or avoid summary judgment, by making a persuasive showing that affirmative evidence would be available, and *giving a valid excuse for non-production.* See also a good Eighth Circuit case *Miller v. Solem,* 728 F.2d [1020] at 1025 n. 1 [ (8th Cir.1984) ].

Since the Court has concluded that even if the plaintiff could establish by discovery that FBI Agents Blasingame and Knox directed the introduction of the flammable material (which is contrary to the uncontradicted facts presently before the Court), nevertheless said movants would be entitled to summary judgment. There is therefore no reason to permit discovery.

Plaintiff's counsel frequently alludes to the public interest in having all of the facts revealed concerning the situation at the Ginter residence on June 3, 1983. The Court is inclined to agree that, in light of all the allegations, charges, and suspicions expressed by plaintiff's counsel, some appropriate investigation of all of the circumstances should perhaps be conducted, if in fact such an investigation has not already taken place. But this personal predilection should not tempt the Court to avoid its obligation to apply the law as it understands it in the instant case filed by Ms. Ginter. Ms. Ginter's action against movants to recover for her personal property loss is not, upon the basis of the undisputed facts and the law, an appropriate vehicle for conducting a wide-ranging investigation into the overall facts and circumstances surrounding the "shoot out" and "burn out" that occurred on June 3, 1983.

For all the reasons stated above, defendants Blasingame's and Knox's motions for summary judgment must be granted. It is therefore Ordered that the motions for summary judgment filed by defendants Blasingame and Knox be, and they are hereby, granted.

## ON MOTION TO DISMISS

The Court now has before it the motion to dismiss filed by separate defendant Jim Stallcup which contends that the complaint should be dismissed for the following reasons:

1. The complaint fails to state a claim for relief.

2. Defendant Stallcup is entitled to qualified immunity.

3. The Court lacks jurisdiction.

The Court has earlier granted summary judgment in this case in favor of FBI Agents James Blasingame and Jack Knox. The charges against those two defendants related to their involvement in the events leading up to the deaths of Sheriff Matthews and Gordon Wendall Kahl and the fire which destroyed the residence. As pointed out in the Memorandum and Order dated February 24, 1986, one of Ms. Ginter's causes of action was for the destruction of her personal property by the fire. Although the complaint does not focus upon Mr. Stallcup's involvement in causing the fire, it does state that "he was present at the plaintiff's home on the night of the arson complained of herein" and that he was acting "as an agent of Lawrence County." Paragraph III under FACTUAL ALLEGATIONS alleges that James Blasingame (of the FBI), Jim Hall, U.S. Marshal, Ed Fitzpatrick, a "state official" and James Stallcup, prosecuting attorney, the highest state and county official present, jointly governed the conduct of all persons present, or in the alternative neglected to fulfill their responsibilities as law enforcement officials to properly supervise the scene. Insofar as the complaint purports to state a cause of action against Mr. Stallcup for the destruction of Ms. Ginter's personal property, said complaint must be dismissed on the basis of Mr. Stallcup's qualified immunity and for the other reasons set forth in the Memorandum and Order relating to the claims against Mr. Blasingame and Mr. Knox. To this extent,

Mr. Stallcup's motion to dismiss will be treated as a motion for summary judgment. As stated, the complaint is much less specific in terms of Mr. Stallcup's involvement in the events leading up to the fire. It is obvious that the real thrust of the plaintiff's complaints against Mr. Stallcup relates to her allegations of false imprisonment, malicious prosecution, denial of her right to consult her attorney, and denial of her right to a fair trial.

As pointed out in the Memorandum and Order of February 24, 1986, the allegations in paragraph VIII, IX and X (with the exception of the references to the destruction of her personal property in paragraph X) raise issues that the plaintiff has no standing to raise and may be ignored for the purpose of the pending motion to dismiss.

Under the caption, CIVIL RIGHTS JURISDICTION, paragraph I, it is stated, *inter alia*:

> After her apprehension and arrest by James Stallcup while she was in the custody of Sheriff Roy Norwell of Boone County during her trial in the harboring case (in which she was represented by court-appointed counsel, Charlie Kerr) she was denied access to the undersigned, her attorney of record in her capital murder case."

The Court has quoted the above allegation because it refers to the defendant, James Stallcup, as the person who apprehended and arrested the plaintiff. However, the Court interprets the rest of the quoted allegation as charging Sheriff Norwell, in whose custody Ms. Ginter was, with denying Ms. Ginter access to her attorney.

The allegations which would appear to most directly implicate Mr. Stallcup are quoted from the complaint as follows:

### CONSTITUTIONAL RIGHTS

#### I

In complete violation of Plaintiff's Fifth and Fourteenth Amendment, due process rights, acting under color of State law, for the purpose of achieving personal publicity to enhance his political career, Lawrence County Prosecuting Attorney, James Stallcup, conspired with other officials to date unknown to:

A) Deny the Plaintiff counsel as an indigent;

B) Deny the Plaintiff the right to a Grand Jury review by swearing to false and misleading accusations claiming the Plaintiff had conspired to kill Sheriff Gene Matthews;

C) Deny the Plaintiff freedom on Bond by concealing pertinent information from the Honorable Judge Andrew Ponder during Plaintiff's bond hearing (several months later after a full bond hearing Judge Ponder released the Plaintiff);

D) Violate the presumption of innocence of the Plaintiff by claiming after she was released from State custody on the malicious and frivolous capital murder charges, that she was guilty;

E) Coordinating and assisting in the cover-up of the arson of the Plaintiff's home;

F) Coordinating and assisting in the violation of the Plaintiff's basic rights as a prisoner and human being by subjecting her prior to trial to cruel and unusual punishment and personal threats;

G) By abusing the legal process and creating unfounded malicious prosecution for the purpose of enhancing his own political career.

H) This has been a contributing course of conduct for said Defendant.

\* \* \*

#### VENUE

\* \* \*

#### PARTIES

\* \* \*

Jim Stallcup, was at the time of this incident, the Prosecuting Attorney, for the County of Lawrence, Arkansas, operating under color of his official capacity, acting under color of the law of the State of Arkansas and Lawrence County at all times mentioned. He was present at the Plaintiff's home on the night of the arson

complained of herein. He was acting as an agent of Lawrence County. He may be served at 225 West Elm, Walnut Ridge, Arkansas 72476.

\* \* \*

## FACTUAL ALLEGATIONS

\* \* \*

### IV.

Uncontrolled pandemonium resulted. Murder and arson occurred at the hands of law enforcement officials. A conspiracy of conspirators including but not limited to, the Defendants cited herein arose to leave Norma Ginter to face the charges for the death of the fugitive and the Sheriff, Gene Matthews as a scape goat to protect the illegal personal interests of the Defendants.

### V.

Norma Ginter, a housewife without so much as a traffic ticket to her name was charged with capital murder, denied a Grand Jury hearing, denied a trial (she filed numerous speedy trial motions), denied critical defense evidence, denied Court appointed counsel (although she was indigent), and occasionally denied access to her own counsel retained only after she had suffered substantial constitutional losses under the Fifth, Fourteenth and Sixth Amendments to the United States Constitution and under the State of Arkansas Constitution.

### VI.

Prosecuting attorney, James Stallcup began a campaign to intimidate and prevent preparation (in violation of the U.S. civil rights) of the Plaintiff's Federal and State cases.

He instructed the new Sheriff, Bob Tomlinson, not to talk to arson investigator, Roy Paul without his permission and out of his presence.

He instructed Medical Examiner Fahmy Malak not to cooperate with Plaintiff's counsel.

He threatened arson investigator Roy Paul with incarceration.

He allowed and encouraged threats of violence by certain State Law enforcement officials against the defense team.

He threatened certain members of the media with retaliation from the Ku Klux Klan in an effort to prevent just coverage.

He violated the Honorable Judge Ponder's Gag Order by disseminating one side reports on the capital murder cases.

He attempted to question the Plaintiff by and through other parties without securing the Plaintiff's counsel's permission.

He succeeded in imprisoning the Plaintiff for seven (7) months, including Christmas Day, on capital murder charges, a crime he knew she was not even remotely guilty of committing.

### DAMAGES

\* \* \*

### PENDENT JURISDICTION

### I.

As a result of false imprisonment, abuse of process, malicious prosecution, and all other actions described herein which also constitute conspiracies and intentional and/or negligent tortious conduct under the State Laws of Arkansas, Plaintiff was damaged as described about in excess of THIRTEEN MILLION DOLLARS ($13,000,000.00).

### II.

In order to prevent this type of malicious illegal conduct on the part of law enforcement officials and government bodies, a small number of which cause damage to the good names of the vast majority, punitive damages should be taxed against them in an amount of not less than three times the actual damages or THIRTY NINE MILLION DOLLARS ($39,000,000.00).

\* \* \*

PRAYER

\* \* \*

A complaint may be dismissed only if "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Kaylor v. Fields,* 661 F.2d 1177, 1181 (8th Cir. 1981). The complaint must contain more than mere conclusory allegations.

The seminal case on the immunity of prosecuting attorneys is *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128, decided by the United States Supreme Court on March 2, 1976. Mr. Imbler was convicted of first degree murder and sentenced to death. After the Supreme Court of California affirmed the case, he filed a state habeas corpus petition alleging, *inter alia,* that the prosecution had knowingly used false testimony and suppressed material evidence at his trial. The Supreme Court of California rejected these contentions. A year later Imbler succeeded in having his death sentenced overturned on grounds unrelated to this case. Rather than re-sentence him, the state stipulated to life imprisonment. Several years later, Imbler filed a habeas corpus petition in the United States district court based upon the same contentions previously urged upon, and rejected by, the Supreme Court of California. The U.S. District Court found eight instances of state misconduct at Mr. Imbler's trial. Six of these allegedly occurred during a witness' testimony and amounted to the culpable use by the prosecution of misleading or false testimony. The other two instances involved suppressions of evidence favorable to Imbler by a fingerprint expert and by the police. The District Court granted the writ. The Ninth Circuit affirmed. The state of California chose not to re-try Imbler and he was released. In 1972, over eleven years after the murder, Imbler filed a civil rights action under Section 1983. He alleged a conspiracy between Pachtman, the prosecuting attorney, the fingerprint expert and various other police officers, to unlawfully charge and convict him, thereby causing him the loss of his liberty and other grievous injuries.

As stated by the United States Supreme Court:

The gravamen of his complaint against Pachtman was that he had "with intent, and on other occasions with negligence" allowed Costello to give false testimony as found by the District Court, and that the fingerprint expert's suppression of evidence was "chargeable under federal law" to Pachtman. In addition Imbler claimed that Pachtman had prosecuted him with knowledge of a lie detector test that had "cleared" Imbler, and that Pachtman had used at trial a police artist's sketch of Hasson's killer made shortly after the crime and allegedly altered to resemble Imbler more closely after the investigation had focused upon him.

Pachtman moved for dismissal under Rule 12(b)(6). The district court noted that public prosecutors had been held immune from civil liability for "acts done as part of their traditional official functions." Finding that Pachtman's acts fell into that category, it granted his motion to dismiss. Imbler appealed to the Ninth Circuit. That court affirmed, finding Pachtman's alleged acts to have been committed "during prosecutorial activities which can only be characterized as an integral part of the judicial process." The Supreme Court granted certiorari. Justice Powell delivered the opinion of the Court. Justice Stevens took no part. Justice White, joined by Justice Brennan and Marshall, filed a concurring opinion.

Justice Powell discussed the history of immunity claims in relation to section 1983. The first case, *Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) established that section 1983 is to be read in harmony with general principles of tort immunities and defenses rather than in derogation of them. The immunity of legislators and judges was discussed. The opinion notes that judges are given absolute immunity for acts committed within their judicial jurisdiction. Local police and most executive officials are given only a qualified immunity. Justice Powell observed

that the considerations underlying the nature of the immunity of officials in suits at common law led to essentially the same immunity under section 1983.

The *Imbler* case presented the Supreme Court with its first opportunity to address the section 1983 liability of a state prosecuting officer. Most of the courts of appeals had held that prosecutors enjoy absolute immunity from section 1983 suits for damages when they act within the scope of their prosecutorial duties. Imbler argued that the prosecutor, as a member of the Executive Branch of the Government, should only be entitled to qualified immunity. Justice Powell commented:

> Petitioner takes an overly simplistic approach to the issue of prosecutorial liability. As noted above, our earlier decision on § 1983 immunities were not products of judicial fiat that officials in different branches of government are differently amenable to suit under § 1983. Rather, each was predicated upon a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it. The liability of a state prosecutor under § 1983 must be determined in the same manner.

The Court then noted that prosecutors' decisions to initiate prosecutions had led to many common-law tort actions for malicious prosecutions. The first American case to address the question was *Griffith v. Slinkard,* 146 Ind. 117, 44 N.E. 1001 (1896). The complaint there charged the prosecutor added the plaintiff's name to a grand jury true bill without probable cause after the grand jurors had refused to indict him. As a result, the plaintiff was arrested and forced to appear in court repeatedly before the charge was finally *nolle prossed.* Despite allegations of malice, the Supreme Court of Indiana dismissed the action on the ground that the prosecutor was absolutely immune. The question first came to the U.S. Supreme Court in the case of *Yaselli v. Goff,* 12 F.2d 396 (2nd Cir. 1926). There a special assistant to the United States Attorney General was alleged to have maliciously and without probable cause procured the plaintiff's grand jury indictment by the willful introduction of false and misleading evidence. The district court dismissed the complaint and the court of appeals affirmed, stating:

> In our opinion the law requires us to hold that a special assistant to the Attorney General of the United States, in the performance of the duties imposed upon him by law, is immune from a civil action for malicious prosecution based on an indictment and prosecution, although it results in a verdict of not guilty rendered by a jury. The immunity is absolute, and is grounded on principles of public policy.

The Supreme Court affirmed in a per curiam opinion.

Justice Powell then discusses the basis for the prosecutor's common-law immunity:

> The common-law immunity of a prosecutor is based upon the same considerations that underlie the common-law immunities of judges and grand jurors acting within the scope of their duties. These include concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust.

Justice Powell then concluded the same considerations of public policy that underlie the common-law rule "likewise countenance absolute immunity under section 1983." After reviewing the public policy considerations, the court states:

> We conclude that the considerations outlined above dictate the same absolute immunity under § 1983 that the prosecutor enjoys at common law. To be sure, this immunity does leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty. But the alternative of qualifying a prosecutor's immunity would disserve the broader public interest. It would prevent the vigorous and fearless performance of the prosecutor's duty that is es-

sential to the proper functioning of the criminal justice system. Moreover, it often would prejudice defendants in criminal cases by skewing post-conviction judicial decisions that should be made with the sole purpose of insuring justice. With the issue thus framed, we find ourselves in agreement with Judge Learned Hand, who wrote of the prosecutor's immunity from actions for malicious prosecution:

> As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been though in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation. *Gregoire v. Biddle*, 177 F.2d 579, 581 (C.A.2 1949), *cert. denied*, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950).

The Court noted that absolute immunity from such civil litigation did not place such officials beyond the reach of the criminal law. Furthermore, the prosecutor would be amenable to professional discipline.

In delineating the boundaries of the *Imbler* holdings, Justice Powell pointed out that absolute immunity was being granted for prosecutorial activities which were "intimately associated with the judicial phase of the criminal process." The Court therefore had no occasion to consider whether such absolute immunity should be granted for those aspects of the prosecutor's responsibility that "cast him in the role of an administrator or investigative officer rather than that of advocate." The Court concludes:

> We hold only that in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983.

Justice White's concurrence in *Imbler* cautioned that a prosecutor who intentionally withheld important evidence might not be entitled to absolute immunity.

The Eighth Circuit had anticipated the *Imbler* rationale in *Barnes v. Dorsey*, 480 F.2d 1057, 1060 (1973) when it stated with reference to the prosecutor, Mr. Moss:

> In regards to Moss, the plaintiff has alleged facts that purportedly demonstrate that Moss was not properly acting within his capacity as a prosecutor. Since we think that the facts alleged fall within acts that may be categorized as prosecutorial, rather than investigatory, functions, dismissal as to Moss was proper. When a prosecutor is acting within the scope of his proper prosecutorial capacity, these actions are cloaked with the same immunity granted to judges. *Wilhelm v. Turner, supra* 431 F.2d [177] at 182–183 [ (8th Cir.1970) ]. We specifically reserve the question of the liability of a prosecutor acting within an investigatory capacity.

Since *Imbler*, the Circuit Courts of Appeal have been struggling to determine the outer boundaries of the prosecutor's absolute immunity. They have focused on the prosecutor's various functions suggesting that non quasi-judicial prosecutorial acts and "investigative and administrative" acts might not be entitled to anything more than qualified immunity. One of the latest pronouncements of the Eighth Circuit is illustrative. In *Smith v. Updegraff*, 744 F.2d 1354 (1984), the Court discussed *Imbler* and then stated:

> The rule in this circuit is clear, "[p]rosecutors enjoy immunity from section 1983 actions 'so long as the actions complained of appear to be within the scope of prosecutorial duties.'" *Price v. Moody*, 677 F.2d 676, 677 (8th Cir.1982) (per curiam) quoting *Keating v. Martin*, 638 F.2d 1121, 1122 (8th Cir.1980) (per curiam).
>
> In *Price* a prisoner filed a pro se complaint against a prosecutor under 42 U.S.C. § 1983. In his complaint the prisoner alleged that the prosecutor, while acting under color of state law, had deprived him of certain federal constitutional rights by ordering his confinement under barbaric conditions. The district court granted the prosecutor's motion to dismiss, ruling that even if the prisoner's allegations were true the prosecutor en-

joyed absolute immunity. This court reversed, holding that the prosecutor would be liable under section 1983 because the prosecutor's actions clearly were not within the scope of his prosecutorial duties.

The question we must answer then is whether Whitehead's conduct was within the scope of his prosecutorial duties. Our review of Smith's complaint and the evidence adduced at trial satisfies us that Whitehead's conduct was outside the scope of his office. First, Robert Hubbell testiifed that Whitehead "hired" him to work undercover to "get Smith no matter what," even if it meant framing Smith. When Hubbell objected, saying he would not do anything illegal, Whitehead reiterated that Hubbell was to get Smith any way he could and that no charges would ever be filed against him by the Jasper County Attorney's Office. Second, Whitehead threatened to prosecute Smith if he attacked the Sheriff's Office during his discharge hearing before the Civil Service Commission. We find these examples of Whitehead's conduct more than sufficient to conclude that Whitehead was acting outside the scope of his prosecutorial duties.

■ The case of *Price v. Moody*, 677 F.2d 676 (8th Cir.1982) cited above in the *Updegraff* case has a direct bearing on one of the issues raised by defendant Stallcup's motion to dismiss. The complaint makes several allegations concerning plaintiff's mistreatment as a prisoner in various situations. Defendant Stallcup is alleged to have conspired with others "coordinating and assisting in the violation of the plaintiff's basic rights as a prisoner and human being by subjecting her prior to trial to cruel and unusual punishment and personal threats." See Complaint, "CONSTITUTIONAL RIGHTS" ¶ I(F). Of course, it could be argued that Mr. Stallcup had no legal authority to control the conditions of plaintiff's incarceration. However, the complaint may be fairly read to claim that Mr. Stallcup directed the imposition of such conditions. And, of course, it directly alleges that he coordinated and assisted in such violations of plaintiff's rights. Practically the same situation was alleged in *Price v. Moody*. There, the prosecuting attorney, Mr. Dan Moody, is alleged to have directed that Price be transferred to the Poplar Bluff jail where he was held "without lights, ventilation, a mattress or a blanket." It was also alleged that the cell was dirty, infested with roaches and bugs and that the plaintiff was given no food, water or showers during a four-day period. Most importantly, it was alleged that Moody specifically ordered that Price be confined under such conditions. The prosecutor moved for dismissal on the ground of absolute immunity and the district court dismissed the complaint on that ground. The Eighth Circuit reversed, stating:

> Taking Price's allegations as true, as we must, it can hardly be asserted that Moody's charged actions were within the scope of prosecutorial duties. Moody's brief in this Court, in essence, stresses that Missouri Sheriffs, and not Missouri prosecutors, have the duty to maintain humane conditions in Missouri jails, *see Tatum v. Houser*, 642 F.2d 253, 254 (8th Cir.1981) (per curiam), and that a prosecutor has no power or authority to order a prisoner to be subjected to barbaric treatment. The fact that Moody may lack state statutory authority over Missouri jails is not dispositive of the section 1983 claim if Moody ordered Price to be mistreated and if the mistreatment occurred as a result of his orders. Thus, the district court erred in holding that Moody was shielded by absolute prosecutorial immunity.

Therefore, the defendant's motion to dismiss the Eighth Amendment claim must be denied.

Fairly read, the complaint charges the defendant Stallcup with arresting the plaintiff without probable cause in violation of her Fourth Amendment rights. The complaint states that Ms. Ginter was apprehended and arrested by Mr. Stallcup. It states that Mr. Stallcup was present at plaintiff's home on the night of the fire. The complaint does not directly and specifi-

cally state the charge upon which she was arrested. However, the complaint does allege that defendant Stallcup charged plaintiff under state law with capital murder which is characterized as "unfounded malicious prosecution for the purpose of enhancing his own political career." So there is the possible inference that she was arrested on the murder charge.

Generally, prosecutors enjoy absolute immunity when making essential prosecutorial decisions but not when performing ordinary police work. In *Marrero v. City of Hialeah,* 625 F.2d 499 (5th Cir.1980), the facts were that Mr. Paul Rashkind, Assistant State Attorney, accompanied police for the purpose of executing a search warrant directed at the premises of a jewelry store owned by the plaintiffs. After the search turned up none of the items listed on the warrant, several of the robbery victims were called in to attempt to identify stolen property. Only one bracelet was identified. After conferring with Mr. Rashkind, the police officers seized the entire stock of the jewelry store and arrested the plaintiffs for receipt of stolen property. The whole episode was covered by media representatives who arrived on the scene with the police and Mr. Rashkind. Mr. Rashkind announced that some $75,000 worth of stolen property had been recovered in the raid. He subsequently formally charged the plaintiffs with receipt of stolen property. A motion to suppress was filed and granted and thereafter no further action was taken in the criminal case. Then a civil suit was filed alleging that the prosecutor willfully abused the search and seizure laws in violation of the plaintiffs' Fourth Amendment rights and also willfully slandered plaintiffs' personal and business reputations. A motion to dismiss was granted relying, *inter alia,* on *Imbler.* The plaintiffs appealed.

■ The Fifth Circuit, after noting that *Imbler* left open the question whether immunity would extend to the prosecutor's administrative or investigative duties, concluded that the acts complained of against Mr. Rashkind did not fall within the sphere

of quasi-judicial activity protected by *Imbler.* The court therefore had to decide the level of immunity, if any, to be accorded those acts. Its opinion states:

The particular prosecutorial activities of which appellants complain are two: Rashkind's alleged participation in the allegedly illegal search and seizure, and Rashkind's alleged slandering of appellants. Neither of these activities falls within the sphere of activity for which prosecutors were given absolute immunity in *Imbler.* Although the *Imbler* Court acknowledged that it will often be difficult to determine whether a particular prosecutorial activity is "investigative or administrative" rather than "quasi-judicial," here we have little difficulty determining that the activities challenged are outside the scope of a prosecutor's quasi-judicial duties.

First, Rashkind's participation in the allegedly illegal search and seizure occurred not only outside the courtroom but prior to the initiation of any judicial proceedings against appellants. Although some activities which a prosecutor undertakes prior to an indictment may be classified as quasi-judicial, such as interviewing grand jury witnesses, *see Cook v. Houston Post,* 616 F.2d 791 (5th Cir.1980), a prosecutor who assists, directs or otherwise participates with, the police in obtaining evidence prior to an indictment undoubtedly is functioning more in his investigative capacity than in his quasi-judicial capacities of "deciding which suits to bring and ... conducting them in court." *Imbler, supra* * * * Second, Rashkind's alleged slandering of appellants also falls outside the sphere of activity given absolute protection in *Imbler.* The defamatory statements attributed to Rashkind occurred outside the confines of the courtroom and were unrelated to any judicial proceeding. Hence, the well established doctrine affording prosecutors absolute immunity from suits for defamatory remarks made during a judicial proceeding, *see Imbler, supra,* 424 U.S. at 426 n. 23, 96 S.Ct. at 993 n. 23; *id.* at 439, 96 S.Ct. at 998

(White, J., concurring), is not applicable here. Moreover, the statements Rashkind is alleged to have made were not made in connection either with the initiation of a prosecution or with activities undertaken in following up a prosecution. Rather, the alleged statements were essentially those of an investigating officer informing the press of activities occurring at the scene of a crime. Thus, the statements were not "intimately associated with the judicial phase of the criminal process." *id.* at 430, 96 S.Ct. at 995, and, accordingly, are not sheltered by *Imbler.*

\* \* \*

[W]hen a prosecutor makes an investigative decision, such as whether to conduct a search and seizure, he is making a decision essentially comparable to that of a policeman. With respect to such decisions, the Supreme Court has determined that a qualified immunity adequately preserves the official's ability to function. *See Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1966 [1967]). We can perceive no reason why prosecutors deserve greater protection for the same kind of decisions, for, as we have previously stated, it is the official *function* that determines the degree of immunity required, not the status of the acting officer.

Similarly, imposing liability upon a prosecutor for making defamatory statements outside his quasi-judicial role would not interfere with the independence of his quasi-judicial functions of deciding which suits to bring and conducting them in court.

Because of a paramount concern for the airing of all evidence, a prosecutor understandably is given an absolute privilege for any of his courtroom statements relevant to the subject matter of the proceedings. *See Imbler, supra,* 424 U.S. at 426 n. 23, 96 S.Ct. at 993 n. 23. Obviously, however, this purpose is not furthered when a prosecutor defames an individual while acting outside his quasi-judicial role.

\* \* \*

Therefore, in light of the Supreme Court's decision in *Butz [v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)], and supported by the policies underlying absolute immunity, we conclude that a prosecutor is not entitled to absolute immunity when he engages in activities outside his quasi-judicial role.

So defendant Stallcup's motion to dismiss plaintiff's charge that he arrested her without probable cause must be denied. If a prosecutor chooses to act essentially as a policeman in making an arrest, he would be entitled to the same level of immunity that a policeman would have in similar circumstances, that is, a qualified immunity. The Court is here presuming that the arrest was without a warrant. If the prosecutor's role was simply to procure an arrest warrant, he would be absolutely immune. See *Lerwill, infra.*

■ The language quoted from the *Marrero* case above with regard to the charge that Rashkind made defamatory statements outside of his quasi-judicial role is also dispositive of plaintiff's charge that Mr. Stallcup violated the presumption of innocence of the plaintiff by "claiming after she was released from state custody on the malicious and frivolous murder charges, that she was guilty." Prosecutors are not given absolute immunity for defamatory statements which they make outside of the confines of the judicial process. See also *Harris v. Harvey,* 605 F.2d 330 (7th Cir.1979); *Powers v. Coe,* 728 F.2d 97 (2d Cir.1984) (prosecutor leaking grand jury information to the press); and *Helstoski v. Goldstein,* 552 F.2d 564, 566 (3d Cir.1977). Therefore, defendant Stallcup's motion to dismiss this claim must be denied.

One of the most serious allegations which the plaintiff makes against the prosecuting attorney, Mr. Stallcup, is that he filed an information charging her with the crime of capital murder without having any legal or factual basis for such charge.

And plaintiff alleges that Mr. Stallcup took such action, not for a public purpose but for the purpose "of enhancing his own political career." More specifically, plaintiff is contending that Ms. Ginter was in custody before Sheriff Matthews was killed and that Mr. Stallcup knew this to be true. See, e.g., *Lisenby v. State of Arkansas*, 260 Ark. 585, 543 S.W.2d 30 (1976). The prosecutor claims absolute immunity as a basis for dismissing this allegation.

The plaintiff's counsel notes several cases decided after *Imbler* which he contends support plaintiff's argument that the defendant would, at best, be entitled only to qualified immunity under such circumstances.

In *Beard v. Udall*, 648 F.2d 1264 (9th Cir.1981), Mr. Roger Beard and his wife were divorced and he was awarded custody of their two minor children in the Maricopa County, Arizona, court. Ms. Beard moved to Apache County where she married Mr. Bill Crabtree and began working as a secretary for the prosecuting attorney, Mr. Stephen Udall. Mr. Beard brought the children to visit his ex-wife. Mr. Udall, representing his secretary, Ms. Crabtree, petitioned Judge Greer, in Apache County, to modify the divorce decree by awarding custody of the children to Ms. Crabtree. Judge Greer set a hearing on an order to show cause and also entered a TRO prohibiting the removal of the children. He set a hearing thereon for July 29, 1977, the date that the TRO was due to expire. The hearing was not held nor was the TRO continued. Mr. Beard returned to Apache County with his new wife and her sister on August 10 and apparently took the children and drove them back to their home in Maricopa County. When it was discovered that the children were no longer in Apache county, a complaint was sworn out charging Mr. Beard with various felonies, including kidnapping. Warrants for arrest were issued and the bond was set at $60,000. The sheriff of Apache County sent a telex to the Maricopa County sheriff regarding the arrest warrants and the latter arrested Beard. Beard presented the custody decree to the arresting officer. The arresting officer was advised by his headquarters that he should nevertheless arrest Beard because the Maricopa County police had contacted Mr. Udall who had advised them that the arrest warrants were valid. When Beard's attorney contacted Judge McDonald of the Maricopa County Court, the latter, aroused by the circumstances and the apparent conflict of interest, telephoned Udall who told the Judge that he was both Crabtree's attorney and the County Attorney, and that he had caused the charges to be brought against Beard. Without going into detail, the civil custody action filed in Maricopa County was dismissed by the Appeals Court and the State Attorney General advised Udall that he would not prosecute the criminal charges against Beard. Thereafter the civil action was filed by Beard and others. The district court awarded summary judgment on the ground that the defendant Udall enjoyed absolute immunity. Beard appealed. The Ninth Circuit in a *per curiam* opinion stated:

[8] Udall's alleged activities, unlike those of the prosecutor in *Imbler*, were performed to further a private purpose. His conduct, therefore, went beyond merely performing his official duties. Beard alleges that Udall caused the criminal charge to be filed in order to further the civil suit Udall had filed on Crabtree's behalf, and that he filed the criminal charges while knowing the charges were baseless. A prosecutor who faces a conflict of interest is in as poor a position to act impartially as a judge who predetermines a judicial proceeding. See *Rankin* [*v. Howard*, 633 F.2d 844 (9th Cir.1980)], *supra*. Therefore, assuming Beard's allegations against Udall are true, we conclude that Udall was acting beyond the scope of his authority and thus does not enjoy absolute immunity.

[9] We wish to emphasize that our holding is a narrow one. We hold only that, where a prosecutor faces an actual conflict of interest, and files charges he or she knows to be baseless, the prosecutor is acting outside the scope of his or her

authority and thus lacks immunity. By limiting the loss of immunity to these circumstances, we believe a prosecutor will be protected from the harassment which concerned the court in *Imbler*, 424 U.S. at 423, 96 S.Ct. at 992.

See *Brooks v. Fitch*, 534 F.Supp. 129 (D.N. J.1981) and *Elliott v. Perez*, 561 F.Supp. 1325 (E.D.La.1983), both of which also involved prosecutors acting with a conflict of interest.

This Court is convinced that *Beard*, *Brooks*, and *Elliott* are wrong and contrary to *Imbler*. When a prosecutor performs the act of filing a criminal information or initiating a prosecution he is entitled to absolute immunity. The court in *Imbler* stated: "We hold that in initiating a prosecution ... the prosecutor is immune from a civil suit for damages under § 1983." Period. And we know that the culpability or viciousness or maliciousness of his motive is immaterial. See *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). In *Beard*, however, we are told that if the prosecutor knows that there is no basis for the charge he is filing *and* if there is a personal professional or financial conflict of interest, then there will be no absolute immunity. In most cases charging malicious and abusive prosecution, it is alleged that there existed no lawful or factual basis for the charge filed by the prosecutor. That is what Ms. Ginter says here. So it must be the conflict of interest motive that has influenced these courts. But there can be no effective absolute immunity that depends on proof of the prosecutor's state of mind. These cases are flawed. In the conflict of interest cases the challenged act lies at the very core of the prosecutor's responsibility: the filing of criminal charges. If the prosecutor's immunity is to turn on his motive or state of mind, that immunity will be illusory. If, after trial, the jury finds for the defendant prosecutor, the judge could then, we suppose, turn to the prosecutor and state, "And by the way you are entitled to absolute immunity."

In *Lerwill v. Joslin*, 712 F.2d 435 (10th Cir.1983), Mr. and Mrs. Lerwill were alleged to have assaulted an animal control officer. The defendant, Gary Joslin, a part-time city attorney, attempted to prosecute for the assault. Under Utah law, Mr. Joslin was only authorized to file criminal charges based on city misdemeanor ordinances. Nevertheless, he presented a complaint charging the Lerwills with violation of state felony statutes and had a warrant issued thereon for the Lerwills' arrest. He then allegedly requested excessive bail and would not permit the Lerwills to pay by personal check. The civil section 1983 suit followed, claiming that Joslin had deprived the plaintiffs of liberty without due process because he was not authorized to file the criminal charges based on state law and had failed to obtain the county attorney's permission before issuing the arrest warrant. The complaint also contended that Mr. Joslin violated the plaintiffs' Eighth Amendment rights by requesting high bail for their release. The lower court rejected Joslin's claim for absolute immunity because of its opinion that he had acted beyond the scope of his authority. A jury found for the plaintiffs and judgment was entered against Joslin in the amount of $14,485.10. The court analyzed the situation as follows:

[2, 3] We begin our analysis by noting that Mr. Joslin's acts against the Lerwills were part of his "initiation and presentation" of a prosecution rather than non-prosecutorial acts for which prosecutors generally are not absolutely immune from section 1983 suits for damages. His filing a criminal complaint against the Lerwills was clearly an initiation of a prosecution. As for the arrest, both before and after *Imbler*, a prosecutor's absolute immunity has extended to his procurement of an arrest warrant. *See, e.g.,* *Martinez v. Chavez*, 574 F.2d 1043 (10th Cir.1978); *Smart v. Jones*, 530 F.2d 64 (5th Cir.), *cert. denied*, 429 U.S. 887, 97 S.Ct. 240, 50 L.Ed.2d 168 (1976); *Gregoire v. Biddle*, 177 F.2d 579 (2d Cir. 1949), *cert. denied*, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950); *Yaselli v.*

*Goff,* 12 F.2d 396 (2d Cir.1926), *aff'd,* 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927). These cases are consistent with *Imbler.* In seeking a warrant for the Lerwills' arrest, Mr. Joslin was acting as an advocate for the State before a neutral magistrate. His presentation of his arguments to a Justice of the Peace thus differs fundamentally from a prosecutor's participating in an illegal search, *see Marrero v. City of Hialeah,* 625 F.2d 499 (5th Cir.1980), *cert. denied sub nom. Rashkind v. Marrero,* 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981), issuing a libelous press release, *id.,* participating in the illegal sale of seized property, *see Coleman [v. Turpen ],* 697 F.2d [1341] at 1341 [ (10th Cir.1982) ], or ordering a warrantless arrest. None of these examples involves a prosecutor's acts as an advocate before a neutral magistrate. To be sure, a prosecutor typically seeks an arrest warrant in an *ex parte* proceeding, in which there is no counterargument by opposing counsel to lessen the danger of prosecutorial misconduct. Nevertheless, we think that a prosecutor's seeking an arrest warrant is too integral a part of his decision to file charges to fall outside the scope of *Imbler.* The purpose of obtaining an arrest warrant is to ensure that the defendant is available for trial and, if found guilty, for punishment. Without the presence of the accused, the initiation of a prosecution would be futile. Thus, a prosecutor's seeking a warrant for the arrest of a defendant against whom he has filed charges is part of his "initiation of a prosecution" under *Imbler.* In addition, for purposes of immunity analysis, a prosecutor's advocacy of a given amount of bail is indistinguishable from his requesting an arrest warrant except that a bail proceeding is not generally *ex parte* and is therefore less subject to abuse. We conclude that Mr. Joslin's filing charges, procuring an arrest warrant, and seeking a particular bail amount were part of his "initiation and presentation" of a prosecution within the meaning of *Imbler.*

The court then discussed the plaintiffs' argument that he could claim absolute immunity only if the state law authorized him to prosecute violations of the particular state statutes he invokes. The court stated:

> Of course, *Imbler* immunizes a prosecutor for filing charges that are beyond his authority in that they are unconstitutional. Moreover, since a prosecutor's immunity is absolute, it applies no matter how obvious it is to the prosecutor that he is acting unconstitutionally and thus beyond his authority. It is not immediately apparent why he should lose that immunity simply because the boundaries he transgressed were prescribed by local law rather than the federal Constitution.

The court then analogized prosecutorial immunity to judicial immunity and went on to state:

> Even if a prosecutor may lose his absolute immunity for prosecutorial acts for which he has no colorable claim of authority, it does not follow that he does so immediately upon crossing the technical bounds of the power conferred on him by local law. Indeed, it has long been a fundamental tenet of immunity doctrine that when a judicial officer has absolute immunity from liability, his immunity does not become qualified simply because he acted in excess of his authority. In *Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1872), the Supreme Court held that while a judge is not absolutely immune for judicial acts taken in "the clear absence of all jurisdiction over the subject matter," he remains immune for such acts that were merely in "excess of [his] jurisdiction."

\* \* \*

In determining whether a prosecutor has lost his absolute immunity by committing a prosecutorial act beyond the scope of his authority, we must interpret his authority broadly. *Stump v. Sparkman,* 435 U.S. [349] at 356, 98 S.Ct. [1099] at 1104 [55 L.Ed.2d 331 (1978) ].

[8] In the case *sub judice,* it is clear that Mr. Joslin was acting within his

authority in one sense: he was authorized to file charges against the Lerwills under Santaquin City ordinances and to seek their arrests for the acts they allegedly committed. He acted beyond his authority in that his complaint cited statutes of a unit of the state's government he was not empowered to represent. * * However, when the statute a prosecutor incorrectly invokes is a local statute that arguably applies to the defendant's alleged behavior, our conclusion is different for two reasons. First, it is a mistake that many honest prosecutors could make. The number of honest prosecutors who might be found liable for inadvertently citing the wrong statute or shrink from their duties for fear of being hauled into court if they did mandates that the prosecutors who do so maliciously be dealt with through remedies other than section 1983, such as state civil or criminal proceedings or a complaint to the state bar.

The court concluded that Mr. Joslin was immune under *Imbler* from the Lerwills' suit, stating:

> We recognize that Mr. Joslin, rather than mistakenly citing the wrong statute in prosecuting the Lerwills, might have intentionally or even maliciously done so in order to harm them. While the Lerwills' inability to sue him under section 1983 is unfortunate if this is true, it is a cost required by *Imbler* to be paid so that honest prosecutors do not shrink from fearless advocacy.

In a footnote, the court dealt with the *Beard* case.

> The Ninth Circuit has held that a prosecutor who files charges beyond the scope of his authority is not immune from a § 1983 suit for damages based on the criminal charges. *Beard v. Udall*, 648 F.2d 1264 (9th Cir.1981) (per curiam). The prosecutor in *Beard* acted beyond his authority by filing baseless criminal charges when he had a conflict of interest. To the extent that *Beard* is inconsistent with our holding today, we decline to follow it. *Beard* conflates [contemplates] two ways in which a prosecu-

tor may exceed his "authority." It relies on cases in which prosecutors were not immune for acts that were beyond the prosecutor's authority in that they were nonprosecutorial, yet the prosecutor in *Beard* had performed a quintessentially prosecutorial act—filing criminal charges—which the court concluded was beyond his authority because of a conflict of interest. The difference is that the latter falls within the literal scope of the *Imbler* holding while the former does not. *Beard* fails to address this difference; the opinion does not explain how to define the scope of a prosecutor's authority and makes no mention of the source of the boundaries that the prosecutor transgressed. Furthermore, *Beard* does not consider the effect of *Bradley* and its progeny. Finally, to the extent to which *Beard* defines "authority" through resort to the technical niceties of local law defining the prosecutor's powers, it is inconsistent with the functional analysis that the Supreme Court has mandated for determining official immunity from § 1983 suits. *See Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

This Court agrees with the *Lerwill* analysis of *Beard*.

Even if the conflict of interest cases like *Beard*, *Brooks* and *Elliott* were accepted as correct, they would not help Ms. Ginter here because there is no allegation that Mr. Stallcup had any such conflict here. Plaintiff's attorney argues in his brief that:

> In the instant case, Plaintiff contends that after discovery, evidence will show that Defendant, Stallcup, initiated the prosecution to advance his own political ambitions; to curry favor with the Judge who had animosity toward the Plaintiff and her husband because of the political views expressed by her husband and several associates; and to attempt to cover up his own past difficulties with the deceased Sheriff, Gene Matthews.

But the personal conflict of interest based upon dual representation, such as is found

in *Beard* and *Brooks,* or in acting to prevent the grand jury from indicting the prosecutor, such as is found in *Elliott,* simply is not present here. The language quoted from the plaintiff's brief simply deals with unworthy motives not connected to a personal type of conflict of interest. And, as we have pointed out, bad motive is irrelevant when the prosecutor is acting within the area of his quasijudicial duties. This distinction is made clear in *Elliott v. Perez,* 561 F.Supp. 1325 (1983) by the court's denying summary judgment on the basis of absolute immunity to the prosecutor, Mr. Leander Perez, while at the same time granting such a motion in favor of the Assistant Prosecuting Attorney, Mr. Frank Klein. This case involved actions by the prosecuting attorney Perez in concert with others to prevent the grand jury from filing an indictment against him personally. Perez filed an information against the foreman of the grand jury, Mr. Elliott. Another information was filed by Mr. Klein, charging Mr. Defley, a witness before the grand jury. Elliott was charged with conspiring to commit extortion on Leander Perez. Defley was charged with tampering. Both Defley and Elliott were arrested, charged, incarcerated, and required to post bonds. Later, the Attorney General of the state of Louisiana intervened and all charges against Defley and Elliott were dropped. They then filed this civil action. The district court stated:

> With regard to Perez's actions in filing the Bill of Information against Elliott and Defley, charging conspiracy to commit extortion, this Court finds that this is precisely the type of activity for which prosecutors have absolute immunity under *Imbler* and but for the conflict issue, Perez would enjoy absolute immunity in that regard. However, if Perez was solely motivated by personal reasons, pursuant to *Beard* he would be acting outside of the scope of his authority and would enjoy no immunity whatsoever. On the other hand should the fact finder conclude from the evidence presented that Defendant Perez was not motivated solely by personal interests (i.e., was in

good faith), he would be entitled to the benefits of *Imbler* immunity.

In summary, for Defendant Perez to have the benefit of either the qualified immunity which would attach to administrative and/or investigative actions (discharging the Special Grand Jury) or to have the benefit of the absolute immunity as set forth in *Imbler* for prosecutorial actions (filing of the Bills of Information), the test is the same. At the time of either action, i.e., discharging the Special Grand Jury or filing the Bills of Information, was Perez acting in good faith or was he solely motivated by self-interest? Material issues of fact remain before that determination can be made.

\* \* \*

As to plaintiffs' allegations against Assistant District Attorney Frank Klein, it is undisputed that Klein had knowledge of the impending indictments against Perez and Delta Development Co., Inc., at the time he filed a Bill of Information against Defley for jury tampering, although Klein has testified that he did not learn that the Special Grand Jury had actually voted the indictments until he read the affidavit of James Elliott, which was attached to Attorney General Guste's Motion to Supersede the District Attorney filed on February 27, 1981. It has been alleged that Klein brought the charges at the insistence of Judge Leon, with strictly retaliatory motivations. Nevertheless, Klein does not fall within the narrow exception carved out by the Ninth Circuit in *Beard.* Although Klein's conduct may have been the result of personal motivations, his personal interest was only one of potential indirect gain. Klein, unlike Perez, was not the target of any impending indictments. Nor was Klein the alleged victim, as well as prosecutor, of any criminal charges against the Plaintiffs, as was Perez. Accordingly, this Court finds that the actions of Defendant, Frank Klein, clearly fall within the scope of his quasi-judicial duties as Assistant District Attorney for the Parish of Plaquemines, Louisiana

(i.e., the initiation and pursuit of criminal prosecutions), thereby entitling him to absolute immunity under *Imbler* whether or not his actions were taken in bad faith.

As previously stated this Court believes *Elliott* to be wrong in denying the prosecutor Perez absolute immunity but, even if the rule stated in the "conflict of interest" cases were to be applied, it would not benefit Ms. Ginter against Mr. Stallcup here.

■ Therefore, the Court concludes that Mr. Stallcup is absolutely immune for his alleged act of filing the murder charge against Ms. Ginter even if he did so with malice coupled with some evil and sinister motive, and even if he knew the charge to be baseless in law and fact. Such is the clear effect of *Imbler*. Hence the motion to dismiss with respect to this allegation will be granted.

■ The *Lerwill* decision also is dispositive of another claim being made by Ms. Ginter, to wit: the claim that Mr. Stallcup denied Ms. Ginter freedom on bond "by concealing pertinent information from the Honorable Judge Andrew Ponder during plaintiff's bond hearing." As will be seen from the language quoted above, the advocacy of a prosecutor of a given amount of bail is considered an integral part of his quasi-judicial duties and falls within the "initiation and presentation" language of *Imbler*. Mr. Stallcup's motion to dismiss this allegation will therefore be granted.

■ Plaintiff asserts that the defendant Stallcup violated many of her rights during the pendency of the state murder charge against her. She first states that she was "denied counsel as an indigent." Under state law, the decision to appoint counsel is made by a judicial officer. See Rule 8.2, A.R.Crim.P. Section 43–605 Ark.Stat (repl. 1977). Insofar as the defendant Stallcup may have participated in the process, that participation would be part of his quasi-judicial duties and, as such, immune under *Imbler*. Therefore defendant Stallcup's motion to dismiss must be granted.

■ Plaintiff claims that she was denied her right to a "grand jury" review. Under Arkansas law a criminal case may be commenced by the return of a grand jury indictment or it may be instituted by filing of an information by the prosecuting attorney. See section 43–806 Ark.Stat. (repl.1977). There is no constitutional right to have the charge presented to a grand jury. See *James v. Reese*, 546 F.2d 325 (9th Cir.1976). Therefore defendant Stallcup's motion to dismiss must be granted.

■ Defendant Stallcup is charged with "coordinating and assisting in the coverup of the arson of the plaintiff's home." No facts are alleged. Nevertheless, the court has held that Mr. Stallcup has a qualified immunity which protects him in this case from Ms. Ginter's action to recover for the destruction of her property. It would seem to follow that if Mr. Stallcup is not liable for the destruction of her property, he would not be liable for the "coverup." Ms. Ginter would not have standing to raise the state's or other persons' possible rights with respect to any destruction or concealment of evidence. For these reasons the motion to dismiss must be granted.

With respect to the state capital murder charge, Ms. Ginter claims that she was "denied a trial ..., denied critical defense evidence, ... and occasionally denied access to her own counsel...." She also claims that Mr. Stallcup "began a campaign to intimidate and prevent preparation ... of the plaintiff's federal and state cases," and that he "instructed the new sheriff, Bob Tomlinson, not to talk to Arson Investigator Roy Paul without his permission and out of his presence," and that he "instructed Medical Examiner Fahmy Malak not to cooperate with plaintiff's counsel," and that he "threatened Arson Investigator Roy Paul with incarceration," and that he "allowed and encouraged threats of violence by certain state law enforcement officials against the defense team," and that he "threatened certain members of the media with retaliation from the Ku Klux Klan in an effort to prevent just coverage," and that he "attempted to

question the plaintiff by and through other parties without securing the plaintiff's counsel's permission," and that he "succeeded in imprisoning the plaintiff for seven months, including Christmas Day, on capital murder charges, a crime he knew she was not even remotely guilty of committing."

■ First it appears that the state charge of capital murder against Ms. Ginter was dropped and dismissed by the state (note allegation that she was released from state custody). Therefore plaintiff's charges, that she was denied a trial, denied critical defense evidence, denied access to her own counsel, and that there was a campaign to prevent preparation, and an effort made to interfere with plaintiff's access to witnesses, and threats made to witnesses and against the defense team and against members of the media, and improper attempts to question the plaintiff through other parties, are moot and/or should have been presented to the state or federal court handling the particular criminal charge involved. Furthermore, although it does not appear in the four corners of the complaint, the information filed in support of defendants Blasingame's and Knox's motion for summary judgment indicates that plaintiff was convicted of harboring Mr. Kahl and a sentence of imprisonment for the time already served was imposed. The question is therefore raised whether plaintiff may properly contend that the imprisonment she suffered was due to the acts of defendant Stallcup or, put another way, that she suffered any imprisonment as a result of his acts that she would not otherwise have suffered. But, even if the plaintiff had been acquitted of the federal charge, it would appear that the prosecutor would be absolutely immune from this consequence of his having initiated the state prosecution against her. See *Imbler*. By the same token, Mr. Stallcup would have absolute immunity for his decision to drop and dismiss the capital murder charge. Therefore, Mr. Stallcup's motion to dismiss with respect to these allegations must be granted.

■ Many of the allegations noted above suggest that plaintiff is charging that her Sixth Amendment right to effective representation by counsel was interfered with by many of the acts of Mr. Stallcup. These complaints clearly should have been presented to the federal or state court handling the particular case. It would obviously not be proper to permit such interference to go unquestioned during the state and federal criminal actions, and then to later claim in a civil suit that one's constitutional rights had been interfered with. This Court must presume that if valid claims of interference with plaintiff's attorney-client relation had been presented to the courts involved, they would have been disposed of in accordance with the applicable standards. Such claims are also now moot.

The plaintiff has no standing to raise the rights of the members of the media or others by objecting to threats against them.

■ Finally, the Court must observe that the fulfillment of its duties in connection with defendant Stallcup's motion to dismiss is made more difficult by the vagueness and lack of specificity in many of the allegations contained in the complaint. As suggested in the Court's Memorandum and Order of February 24, 1986, a double standard is developing with respect to the degree of factual specificity which must be pled in civil cases against public officials who may be entitled to absolute or qualified immunity on the one hand and the ordinary "run of the mill" civil cases on the other. The case that most clearly articulates the problem and the rationale is *Elliott v. Perez*, 751 F.2d 1472 (5th Cir.1985). This is an appeal from the district court case of *Elliott v. Perez*, cited above. The prosecutor, Perez, did not appeal. Rather, it was the plaintiffs who appealed the lower court's dismissal as to the judge, Judge Leon, and the Assistant District Attorney Klein. The Fifth Circuit did not get to the merits of the issues raised. Rather, it stated:

We find that the absolute constitutional tort immunity accorded to some government officials requires the trial judge to demand heightened standards of pleading by plaintiffs in cases in which that doctrine is going to come into play. In cases against governmental officials involving the likely defense of immunity we require of trial judges that they demand that the plaintiff's complaint state with factual detail and particularity the basis for the claim which necessarily includes why the defendant-official cannot successfully maintain the defense of immunity. We therefore vacate the judgment (as to Klein and Judge Leon) and remand to the district court.

After discussing the immunity doctrine, the court quoted from *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and went on to say:

The *Harlow* court expressed its belief that the new *Harlow* qualified immunity standard would permit "the resolution of many insubstantial claims on summary judgment." *Id.* 457 U.S., at 818, 102 S.Ct. at 2739. Consonant with its desire to shield public officials from the diversion of their energies through the forced defense of challenges to actions taken in their governmental capacities, the Court held that until resolution of the threshold question of the application of an immunity defense, "discovery should not be allowed." *Id. Harlow* therefore was born out of the experience-based recognition that until the time the trial court can determine whether there is a substantial basis for the claim of immunity, those entitled to official immunity should be free not only from ultimate liability, but also from trial, and the ofttime overwhelming preliminaries of modern litigation.

The court then discussed the cases from the Fifth Circuit and went on to ask:

What is a federal trial judge to do? One thing he may not do: face it as just another lawsuit in which the notice pleading's liberal policy of F.R.Civ.P. 8 counts on pretrial discovery to ascertain the factual basis for the claim, and as here, a defense. Allowing pretrial depositions, especially those taken adversely of the governmental official to ferret all of his actions and the reasons therefor, either for the purpose of being able to plead more specifically, or for the use in the prospective trial would defeat and frustrate the function and purpose of the absolute and qualified immunity ostensibly conferred on the official.

The public goals sought by official immunity are not procedural. Indeed, they go to very fundamental substantive objectives. To the extent that F.R.Civ.P. 8 and the practices under it present any conflict, the trial court must find a way to adapt its procedures to assure full effectuation of this substantive right, since the Enabling Act provides that the rules shall not abridge, enlarge or modify any substantive right.

In addition, use of liberal discovery to establish the basis of a claim is directly at odds with the Court's direction in *Harlow* that government officials entitled to immunity be freed from the burdens, the stress, the anxieties and the diversions of pretrial preparations.

Actually, we, and other courts, have tightened the application of Rule 8 where the very nature of the litigation compels it. In the now familiar cases invoking 42 U.S.C. § 1983 we consistently require the claimant to state specific facts, not merely conclusory allegations.

Likewise, in habeas cases, 28 U.S.C. § 2254 (*see* Rule 2, Habeas Rules), this court has consistently held that conclusory allegations unsupported by allegations of specific facts are insufficient to support constitutional claims. This is so even in *pro se* petitions.

Probably of greatest importance is that the burden of being able to ascertain what the real facts are in order to determine the defense of immunity is placed squarely on the district judge. The trial judge may not wait on motions or other actions by the parties or counsel. Fortunately, trial judges have the tools to carry out this mission.

Foremost is the recent amendments to F.R.Civ.P. 11. * * *

Amended Rule 11, a significant part of the new approach of all of the 1983 amendments, and especially Rule 16 are intended to place on the shoulders of a federal trial judge the role of an active manager and director of the whole litigation process.

*　　*　　*

It bears the strongest emphasis that under amended Rule 11 an attorney's signature on a document certifies that, "to the best of his knowledge, information, and belief formed after *reasonably inquiry* it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, ..." F.R.Civ.P. 11, advisory committee note. (emphasis supplied). This means that in a case ostensibly raising the probable question of immunity, counsel for the plaintiff is affirming that, after making reasonable inquiry, he believes in good faith that the defendant official cannot successfully show he has the defense of immunity. This means also that having that good faith belief, he is able to state with some particularity what those facts are.

The trial judge has several means to determine the specific facts on which plaintiff relies, from which the judge can draw the legal conclusion on the availability of the immunity defense. First, the judge can, and must, demand full compliance with Rule 11.

In order to ensure sufficient specificity, district courts have a ready tool in the F.R.Civ.P. 12(e) motion for more definite statement. Once a complaint against a defendant state legislator, judge, or prosecutor (or similar officer) adequately raises the likely issue of immunity—qualified or absolute—the district court should on its own require of the plaintiff a detailed complaint alleging with particularity all material facts on which he contends he will establish his right to recovery, which will include detailed facts supporting the contention that the plea of immunity cannot be sustained. The court remanded the case to the district court for action consistent with the opinion. Judge Higginbotham wrote a concurring opinion. While recognizing the problem he stated that he would follow a more modest path. He stated:

> Federal Rule of Civil Procedure 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Congress, of course, sanctioned Rule 9(b) in the Enabling Act, 28 U.S.C. § 2072, but I do not know where we find the authority to add the requirement that claims against officials who enjoy immunity from suit shall be pled with particularity. Nor do I see that it is necessary to the result to do so. Rather, I would conclude that no claim is stated against officials who hold positions which enjoy absolute immunity absent a statement of sufficient facts which, if true, would demonstrate the absence of immunity. If the filing of a complaint grants immediate access to our elaborate discovery machine and our substantive law teaches that such access is not available in immunity cases, it follows for me that absent the detailing of facts sufficient to negative immunity, no federal claim is stated.

Judge Higginbotham then points out that this requirement is similar to that imposed in antitrust cases. He then concludes:

> That such an approach is not a judicial amendment to Rule 9(b) but is rather a definition of the claim is more convincing in the immunity context. If immunity protects a defendant from the discovery process, as it does, and the statement of a claim grants access to that process, as it does under notice pleading, then a well-pleaded claim must overcome the immunity. Of course, some plaintiffs will be unable to state a claim without the benefit of discovery, even though discovery might have surfaced sufficient facts, but denial of some meritorious claims is the direct product of the immunity doctrine which weighed these losses when it

struck the policy balance. This, at least for me, only makes the plainer that I am on sure ground in concluding that the accommodation of notice pleading and immunity presents a question of claim definition, peculiarly within the authority granted to us by Article III.

This is far more than a semantical shell game. We must solve judicial problems, and we must not solve legislative problems. My effort has been to demonstrate that it is a judicial problem—defining the content of immunity—that we face here. By this path, I reach the same conclusion as the majority and therefore join its result.

On the basis of the *Elliott* case, this Court concludes that the plaintiff must file a substituted complaint which sets forth a more definite, certain and specific factual statement of those claims in her complaint which have survived the motions previously filed. The substituted complaint must be filed on or before March 30, 1986. The Court emphasizes that it is not here granting leave to file an "amended" complaint, no motion therefore having been filed. It is requiring simply a more definite statement, in compliance with *Elliott,* of the claims that have already been asserted but have not heretofore been disposed of.

SO ORDERED.

### SUPPLEMENTAL MEMORANDUM AND ORDER

On March 6, 1986, this Court entered its "Memorandum and Order" dealing with the motion to dismiss filed by separate defendant James Stallcup. In that Order, this Court sustained Mr. Stallcup's motion with respect to several of the causes of action being asserted by the plaintiff. The Court did not dismiss certain other claims by the plaintiff but by order, dated March 7, 1986, it directed that the plaintiff file a substituted complaint on or before March 30, 1986, as specified in the March 6, 1986 order. The affected and remaining defendants were directed to answer or otherwise plead to the substituted complaint on or before April 10, 1986.

The Court's requirement that the plaintiff file a more detailed substituted complaint covering claims she had already asserted but which had not theretofore been disposed of, was based upon the rationale stated in *Elliott v. Perez,* 751 F.2d 1472 (5th Cir.1985). That case held that the trial court should "demand heightened standards of pleadings by plaintiffs" in cases where the doctrine of absolute constitutional tort immunity comes into play. In these cases the trial court is to require that the plaintiff's complaint "state with factual detail and particularity the basis for the claim which necessarily includes why the defendant-official cannot successfully maintain the defense of immunity." The plaintiff filed her "Substituted Petition" on March 28, 1986, in order to comply with this Court's order of March 6, 1986. On April 10, 1986, separate defendant James Stallcup filed an answer to the Substituted Petition. In this separate answer, the defendant Stallcup analyzes the plaintiff's Substituted Petition and contends that the plaintiff has not complied with the Court's order of March 6, 1986, by making her complaint more definite and certain and by properly specifying the factual details of her remaining claims. The Court will therefore again take up defendant Stallcup's motion to dismiss in the light of the allegations contained in the "Substituted Petition."

The claims of the plaintiff against the defendant, James Stallcup, which survive the March 6, 1986 order of the Court are:

1. That the defendant arrested and apprehended the plaintiff without probable cause.

2. That the defendant caused the plaintiff to be imprisoned under unconstitutional conditions.

3. That the defendant slandered and defamed the plaintiff by stating outside of the judicial process that she was guilty of murder.

It is now necessary to review the allegations contained in the "Substituted Petition" filed March 28, 1986. The first six paragraphs contain the jurisdictional alle-

gations. Paragraphs VII, VIII and IX refer to the burning of the plaintiff's home on June 3, 1983. Those allegations relate to the claim of the plaintiff against defendants Tom Lee and the city of Ravenden, Arkansas, and not to defendant James Stallcup. In this respect, the Court notes the following language from its March 6, 1986, order:

> Insofar as the complaint purports to state a cause of action against Mr. Stallcup for the destruction of Ms. Ginter's personal property, said complaint must be dismissed on the basis of Mr. Stallcup's qualified immunity and for the other reasons set forth in the Memorandum and Order relating to the claims against Mr. Blasingame and Mr. Knox.

The paragraphs of the Substituted Petition which dealt with the surviving claims against Mr. Stallcup read as follows:

### X.

Lawrence County Prosecutor, James Stallcup, was present at the Plaintiff's home in Smithville, Arkansas. Acting, still under color of State law and still as an agent for Lawrence County, but outside of his quasi-judicial prosecutorial functions, James Stallcup arrested the Plaintiff on a charge of capital murder. (Arkansas Statute 41–1501) At the time of the death of the victim of this alleged "capital murder", the Plaintiff was already in police custody. Any act of "harboring" Plaintiff may have done was ended, as was any possible "accomplice" relationship. Defendant Stallcup violated Plaintiff's Fourth Amendment right not to be arrested without probable cause.

### XI.

Lawrence County Prosecutor, James Stallcup used the power of his office and his influence to cause Plaintiff to be imprisoned under conditions of threats of violence, harassment, improper clothing, improper hygiene, lack of medical attention, and lack of privacy, which violated her Eighth Amendment right to be free from cruel and inhuman punishment.

### XII.

Defendant, James Stallcup, while acting in his capacity as Lawrence County Prosecutor uttered defamatory statements outside the confines of the judicial process. He violated the "Gag Order" imposed by Judge Andrew [Ponder] and disseminated one-sided reports to the press on the "capital murder case" before its dismissal. In addition, Defendant Stallcup violated Plaintiff's Constitutional right to the presumption of innocence by claiming, after she was released from state custody on the malicious and frivolous "capital murder" charges, that she was "guilty."

In the "Answer of Separate Defendant James Stallcup to Plaintiff's Substituted Petition" filed April 10, 1986, defendant Stallcup denies the allegations contained in paragraph X, "except that to admit that he was present in the plaintiff's home at some point on June 3, 1985 [sic]." The defendant, Stallcup, contends that the plaintiff has not provided the specification required by this Court's Order of March 6, 1986. And he states that he "has consistently denied that he participated 'in an arrest'."

■ The Court concludes that the Substituted Petition does meet the minimum requirements of the order of March 6, 1986. This claim is simply that the defendant, Stallcup, acting under color of state law as an agent for Lawrence County but "outside of his quasi-judicial prosecutorial functions" arrested the plaintiff on a charge of capital murder without probable cause. While only a bare minimum of facts are alleged, the allegations are sufficient. Discovery will be available to the parties as this claim goes forward. See below.

■ In her second cause of action against the defendant, Stallcup, in the Substituted Petition, plaintiff alleges that Mr. Stallcup "used the power of his office and his influence to cause plaintiff to be imprisoned under threats of violence, harassment,

improper clothing, improper hygiene, lack of medical attention, and lack of privacy...." These allegations are insufficient to meet the requirements of the Court's order of March 6, 1986. If the plaintiff wishes to pursue this cause of action she must amend paragraph XI of her Substituted Petition to specifically identify the person or persons that Mr. Stallcup is alleged to have influenced "to cause plaintiff to be imprisoned" under such conditions. She must also specify the location and identity of the place or places where she is alleged to have been so imprisoned, the precise dates and periods of each such imprisonment and, if more than one place of imprisonment is involved, the particular unconstitutional conditions to which she was subjected at each such place of imprisonment. The plaintiff will be given ten days from the date of this Order to so amend paragraph XI. If it is not so amended, that cause of action will be dismissed for failure to comply with the Court's order of March 6, 1986.

 The final cause of action asserted by the plaintiff against Mr. Stallcup in the Substituted Petition is for slander and defamation "outside the confines of the judicial process." The allegation that the defendant, Stallcup, "violated the 'gag order' imposed by Judge Andrew Ponder and disseminated one-sided reports to the press on the 'capital murder case' before its dismissal" will be stricken for failure to comply with the Court's order of March 6, 1986, in not specifying the language of the "gag order" or the manner in which it was violated but also because it is not for this Court or a jury to handle the alleged violations of court orders during the course of a criminal proceeding. Any such contention should have been brought to the attention of Judge Ponder so that he could have properly enforced his "gag order." However, the allegations in paragraph XII that defendant Stallcup uttered defamatory statements outside the judicial process by claiming in effect that the plaintiff was guilty of capital murder meets the minimum requirements of the Court's order of March 6, 1986, even though the precise

language alleged to have been used and the precise circumstances surrounding the making of such a statement has not been alleged. This inadequacy does leave some problem because certain public statements made by prosecutors in the course of and intimately associated with the judicial phase of a prosecution may be covered by the immunity defense. See the discussion of this issue in the Court's order of March 6, 1986, page 16, and the cases referred to therein.

As stated above, the plaintiff will be given ten days from this date in which to amend paragraph XI of her Substituted Petition. The Court will also order the opening of discovery ten days from the date of this Order on the remaining claims of the plaintiff against the remaining defendants.

IT IS THEREFORE ORDERED that the plaintiff make more specific her claim that the defendant, Stallcup, caused her to be imprisoned under unconstitutional conditions (as explained and specified above) on or before the 23rd day of June, 1986.

IT IS FURTHER ORDERED that defendant Stallcup's motion to dismiss the plaintiff's claim that he arrested her without probable cause be, and it is hereby, denied.

IT IS FURTHER ORDERED that defendant Stallcup's motion to dismiss the charge that he slandered plaintiff by stating that she was guilty of the capital murder charge be, and it is hereby, denied.

IT IS FURTHER ORDERED that the charge that defendant Stallcup violated the "gag order" imposed by Judge Andrew Ponder and disseminated one-sided reports on the capital murder case before its dismissal be, and it is hereby, dismissed.

IT IS FURTHER ORDERED that discovery with respect to the remaining claims and the remaining defendants be opened on the 23rd day of June, 1986. A scheduling order will soon be entered setting the case for trial, and providing for discovery cutoff and the filing of trial briefs and requested instructions.

## ORDER

Pending before the Court is Plaintiff's Motion for Leave to File Amended Petition and Motion to Consolidate.

Grant or denial of an opportunity to amend complaint is within the sound discretion of the district court. *Unlaub Co., Inc., v. Sexton,* 427 F.Supp. 1360 (W.D.Ark. 1977). As grounds for the motion to amend, plaintiff requests, most significantly, that law enforcement officials, Ed Fitzpatrick and Jim Hall be added as new party defendants. By order dated February 24, 1986, the Court dismissed this action against FBI agents James Blasingame and Jack Knox based, *inter alia,* on qualified immunity and public policy considerations. The Court subsequently dismissed certain claims against defendant James Stallcup, in its March 6, 1986 order. That defendant is now seeking the dismissal of the remaining claims. The Court is presently considering and will address those issues forthwith.

In light of the Court's prior rulings, this case has been narrowed down to issues involving defendants James Stallcup, Lawrence County, Tom Lee and the City of Ravenden. Considering the findings of fact and conclusions of law made by the Court in its order dismissing Blasingame and Knox, and the factual submissions of the parties in connection with the motion for summary judgment filed by those two defendants, it appears that the legal status of the defendant Tom Lee would be quite similar to that of Blasingame and Knox. Of course the defendants Lee and the City of Ravenden have filed no motions for summary judgment so it is possible that the factual situation regarding these defendants is different from that relating to Blasingame and Knox. In any event there is the possibility that the claims against the defendants Lee and the City of Ravenden will be dismissed. If so the case would boil down to an action against the prosecutor, Mr. Stallcup and Lawrence County. It would not be in the interest of judicial economy to permit the Amended Complaint to be filed in this action setting up entirely new and different claims against new parties. Nor would it be appropriate to permit the plaintiff to attempt to bring back in, through the device of an Amended Complaint, other parties already dismissed from this action. The issues relating to the defendant Stallcup are sufficiently complex and distinct from those raised in the proposed Amended Complaint concerning other persons, that judicial discretion dictates that such matters be kept separate and apart. Plaintiff's Motion to Amend Complaint will be denied. It is so ORDERED.

In her Motion to Consolidate, plaintiff appears to be requesting that the previous decisions discharging the defendants Blasingame and Knox and dismissing certain claims against James Stallcup be consolidated into one action for the purpose of appeal to effect judicial economy. It is unclear to the Court why consolidation would be necessary when no final order has been entered regarding the defendant Stallcup. Additionally, the final, appealable order dismissing the complaint against law enforcement officials Blasingame and Knox, was premised on conclusions of law entirely different from those applied by the Court in dismissing certain claims against prosecuting attorney James Stallcup. Consolidation of these separate and distinct issues would serve no useful purpose.

It is therefore ORDERED, that Plaintiff's Motion to Consolidate be, and it is hereby, denied.